## WALLACE *v.* LOOMIS.

1. The provision in the Constitution of Alabama, which declares that "corporations may be formed under general laws, but shall not be created by special acts, except for municipal purposes," does not prohibit the legislature from passing a special act changing the name of an existing railroad corporation, and giving it power to purchase additional property.
2. A party is estopped from denying the corporate existence of a company when, by holding its bonds, he acquires a *locus standi* in the suit brought to foreclose the mortgage made to secure their payment.
3. The sale of a bankrupt's property under proceedings in involuntary bankruptcy cannot be invalidated by the fact that he, before their commencement, had promised to pay in full his debt to a creditor who, at his instance, instituted them.
4. The act of Congress approved March 2, 1809 (2 Stat. 534), provides that, in case of the disability of a judge of the District Court of the United States to perform the duties of his office, such duties shall be performed by the

justice of the Supreme Court allotted to the circuit which embraces the district. By the second section of the act approved April 10, 1869 (16 id. 44), the same power is conferred upon the circuit judge.

5. Where bonds of a corporation, as prepared for issue and sale, promise payment in lawful money, and, as such, were guaranteed by a State, a stipulation that they shall be paid in coin, subsequently indorsed on them by the corporation, in accordance with the requirement of purchasers from it, is supplementary and subsidiary, and binds only the corporation itself.

6. A court of equity having jurisdiction of the subject-matter and the parties, when it takes charge of a railroad and its appurtenances, as a trust fund for the payment of incumbrances, has power to appoint managing receivers of the property, and, for its preservation and management, authorize moneys to be raised, and declare the same chargeable as a paramount lien on the fund.

APPEAL from the Circuit Court of the United States for the Southern District of Alabama.

The facts are stated in the opinion of the court.

*Mr. John T. Morgan* for the appellant.
*Mr. Philip Phillips* and *Mr. William A. Maury, contra.*

MR. JUSTICE BRADLEY delivered the opinion of the court.

This suit was instituted, by a bill in equity filed May 30, 1872, by Francis B. Loomis, John C. Stanton, and Daniel N. Stanton, trustees of what is known as the first mortgage of the Alabama and Chattanooga Railroad Company, for the purpose of procuring a foreclosure and sale of the mortgaged premises, being the railroad of said company, with its appurtenances and rolling-stock, situated in Tennessee, Georgia, Alabama, and Mississippi, but principally in Alabama. A further object of the bill was to remove the cloud from the title caused by the bankruptcy of said company, the seizure of its property by the governor of Alabama, and the sale thereof by the assignees in bankruptcy; also, to protect and preserve the property from waste and dilapidation until it could be applied to the satisfaction of the mortgage.

The bill stated that the mortgage in question was executed and delivered to the trustees, Dec. 19, 1868, and a copy of the same was annexed to the bill as an exhibit. It was further stated that, under the mortgage, the company issued a large number of bonds, each for $1,000, with interest at the rate of eight per cent per annum, payable in gold coin, semi-annually,

on the 1st of January and July in each year; it being provided in each bond that the amount should not exceed $16,000 per mile. A copy of one of these bonds, and of the indorsements thereon, was also annexed to the bill as an exhibit. The bill stated that the bonds were indorsed by the governor of the State of Alabama with the guaranty of the State; and the same fact is recited in the mortgage, referring to certain acts of the legislature of Alabama, passed in 1867 and 1868, which authorized the governor of the State to indorse and guarantee such bonds to the extent of $16,000 per mile of the road, upon certain conditions being performed by the company. The bond appended to the bill is in the usual form of such instruments, the principal and interest being payable in lawful money of the United States. The coupons are also in the usual form. The first indorsement on the bond is by the governor of Alabama, and recites the acts by virtue of which the indorsement was made, and declares that the State is liable for the payment of the principal and interest of the bond. A further indorsement is also made by the company, agreeing to pay the principal and interest in coined money of the United States; but no such agreement is referred to in the mortgage nor on the face of the bond.

The bill stated that the number of bonds issued and indorsed was five thousand two hundred, amounting to $5,200,000; and that they were all issued and disposed of to various persons, who claimed, by virtue thereof, a first lien on the road and property mortgaged. It then stated that the railroad company failed to pay the instalments of interest which became due on the 1st of January and July, 1871, and the 1st of January, 1872; and that, though the governor of the State had paid a large portion thereof, yet he refused to pay in any thing but currency (which was received by the bondholders under protest); and he also refused to pay the interest on a large number of the bonds, because the holders thereof did not present to him proof that they were *bona fide* purchasers of the bonds held by them, though in fact they were such purchasers. [By an amended and supplemental bill, filed July 6, 1872, it was stated that the instalment of interest which became due on the 1st of July, 1872, was not paid in any manner, but that pay-

ment thereof had been totally refused. It was further stated, and so appears by the mortgage, that, upon failure by the company to pay any instalment of interest for the space of three months, the trustees were authorized to take possession of and sell the road, and pay the whole amount of principal and interest from the proceeds of such sale.]

The original bill further stated that the governor of Alabama claimed the right, by virtue of the payments made by. him, and the delinquency of the company, to seize the road and its appurtenances, and did seize the same, and placed the same in the possession of a receiver by him appointed, who attempted to operate the road in the States of Alabama and Mississippi, but by his neglect and mismanagement the property had become greatly injured and deteriorated.

The bill further stated that the governor of Alabama had also filed bills for the foreclosure and sale of the road and its equipments in the States of Alabama, Mississippi, Georgia, and Tennessee (in all of which States portions of the road were situated), and had procured the appointment of receivers in said States, who took possession of the said several portions of the road; and that the governor had also procured the company to be declared bankrupt in the District Court of the United States for the Middle District of Alabama, which court had appointed assignees in bankruptcy of said company; and that the said assignees had made a pretended sale of the property, at which sale the governor had purchased the same under the pretence of purchasing it for the State of Alabama. The bill charged that this was a mere pretence, and that the purchase was really made for the benefit of other parties. The bill also stated that the company was sued by many persons, and that, by reason of the multiplicity of suits, the property of the company would be greatly deteriorated and wasted, and the possession thereof by those entitled thereto would be greatly interfered with.

The bill further stated, that, by reason of the various conflicting claims set up to said railway and other property ·by the various receivers and assignees, each denying to the other authority to run, operate, or control the same, the said property was permitted to go to destruction, and was being injured

to the amount of $1,000 a day; and that the damage and injury already done to said property by said mismanagement exceeded $1,500,000; that the interest of the bondholders was being greatly impaired, and that the property had ceased to be sufficient security for their payment. Various other statements were made with regard to the rapid deterioration of the property, the clouds cast upon the title thereto by the various legal proceedings, &c., and prayed for the appointment of receivers with power to raise money to make necessary repairs, and to manage the property until it should be sold by order of the court.

The defendants to the original bill were the Alabama and Chattanooga Railroad Company, the trustees of the second mortgage, the receivers appointed by the State courts at the instance of the governor of Alabama, the assignees in bankruptcy, Governor Lindsay in his individual capacity, the receiver appointed by him, and one Caldwell, an officer who had advertised much of the loose property for sale.

The bill was first presented to the justice of the fifth circuit, at Galveston, in May, 1872; and an order was granted to show cause at the next Circuit Court, to be held at Mobile in June, why an injunction should not be granted and a receiver appointed. No hearing was had, however, at that term. Separate answers were filed by R. B. Lindsay, governor of Alabama, in his individual capacity, by Charles Walsh, the receiver appointed at the governor's instance by the State courts of Alabama and Mississippi, and by William T. Wofford, the receiver appointed at the same instance by the State court of Georgia. The governor vindicated the course he had taken, and repelled the charges of collusion made against him in the bill. Walsh did little more than disclaim any interest in the controversy; and Wofford detailed the circumstances of his appointment as receiver, and the manner in which he had endeavored to discharge his duties as such. Numerous affidavits were taken, and documents exhibited on the condition of the road, and on the various points that were made by the parties. Finally, by general agreement, application was again made to the justice of the circuit in August, 1872, for an injunction and the appointment of a receiver, and a large mass of affidavits and doc-

uments was produced, showing the necessity of immediate interposition of the court to save the property from absolute destruction. No opposition was now made to the appointment of receivers as asked by the bill, but the appointment was consented to by the governor of Alabama, and acquiesced in by all the parties. The complainants, by an amendment to their bill, withdrew all charges of improper conduct on the part of the governor and his agents. Arrangements had been made with him, by which all objections arising from the claims of the State to the possession of the road, to the proceedings in bankruptcy, and to the appointment of receivers by the State courts, were obviated, — it being agreed that the proceedings by which the latter had been appointed should be discontinued. Under these circumstances, an order for an injunction and the appointment of receivers was made on the twenty-sixth day of August, 1872. This order, amongst other things, recited as follows :—

"It appears, by the affidavits and proofs duly submitted and filed in this cause, that the property in question, to wit, the railroad and connecting works, and other property late of the Alabama and Chattanooga Railroad Company, which are embraced in and covered by the mortgage known as the first mortgage of said company, are rapidly deteriorating in value, and being wasted, scattered, and destroyed, whereby the security of the first-mortgage bondholders, and the interest of all other persons concerned in said property, are subject to great hazard and danger of entire sacrifice.

"And whereas the governor of Alabama, on behalf of said State, has purchased the said property at the sale thereof by the assignees in bankruptcy of the said company, for the purpose of protecting the interests of said State, as guarantor or indorser of $4,720,000 of said first-mortgage bonds, the indorsement of which has heretofore been recognized by the governor of Alabama as valid, or upon which he has heretofore paid interest, but it appears that the said State, as well as the said company, has failed to pay the full amount of interest due on said bonds;

"And whereas, in the present condition of said property, it is impossible, without great sacrifice, to dispose of the same in any manner; and whereas it has been proposed and agreed by the parties interested that all further opposition to the proceedings in bankruptcy against said company in the District Court for the Middle District of Alabama shall be withdrawn, and that the said

proceedings shall be affirmed; and that all other proceedings for the appointment of receivers in the several State and District courts shall be discontinued, so that the proceedings in this suit shall have full effect and operation without undue embarrassment, and that a receiver or receivers shall be appointed in this cause, to take charge of said property, and put the same into proper condition for its preservation and disposition, for the mutual benefit of all parties interested therein;

"And whereas, in view of all the evidence and admissions of the parties, the court is satisfied that a receiver or receivers ought to be appointed to take charge of the entire property and manage the same, and to put the same in order and repair, to prevent the entire destruction thereof."

The order then appointed three receivers, with power to take possession of the property and collect the debts and claims due to the company, and also with power to put the road and property in repair, and to complete any uncompleted portions thereof, and to procure rolling-stock, and to manage and operate the road to the best advantage, so as to prevent the property from further deteriorating, and to save and preserve the same for the benefit and interest of the first-mortgage bondholders, and all others having an interest therein. The order also provided that, to enable the receivers to perform the duty imposed upon them, they might raise money to an amount limited in the order, by loan, if necessary, upon certificates to be issued by them, which should be a first lien on the property.

Up to this point of time, Wallace, the present appellant, was not a party; but, as a holder of second-mortgage bonds, was, with the other holders of such bonds, represented in the suit and proceedings by the trustees of the second mortgage, who were defendants, and had due notice of, and acquiesced in, all that was done.

In February, 1873, by leave of the court, Wallace was made a defendant, and thereupon filed an answer and cross-bill, claiming to be the holder and owner of five second-mortgage bonds for $1,000 each. His answer was, in substance, as follows: He denied that the Alabama and Chattanooga Railroad Company was a corporate body, though admitting that there was a joint-stock company so called, and contending (as was necessary to

do in order to sustain his own claim) that the bonds and mort-
gages issued by it were valid and binding in equity as a lien
on the property in question; he denied that all the first and
second mortgage bonds were valid, contending that many of
them were held *mala fide* and without consideration; he denied
the validity of the bankrupt proceedings against the company,
and the validity of the sale of the property by virtue thereof;
he denied that the State was liable on the first-mortgage bonds,
and that the governor of Alabama had any right to pay interest
or to seize the road therefor; and affirmed that the trustees of
the first and second mortgages had the superior right to take
possession of said property, under the powers conferred in the
mortgages.

It is difficult to see how the allegations of the answer, if true,
could furnish any fair ground of defence to the bill. It rather
corroborated the position of the complainants than otherwise,
and furnished additional reasons for the relief which they asked.
Indeed, the cross-bill, which was filed at the same time with
the answer, and which amplified the averments thereof, prayed
that the first and second mortgages might be sustained for the
benefit of all *bona fide* owners of bonds issued under the same,
and that the court would continue to hold the property in the
hands of receivers, and would continue to direct and control
them in the administration thereof; and that, when a sale of
the property should become necessary and advantageous to all
concerned, the proceeds be brought into court, and paid to the
parties entitled thereto.

This hardly bears the aspect of opposition to the general
object of the original bill; but, as the appellant objects to
the decree for pronouncing against the positions taken in the
answer, and has argued the subject with much earnestness, as
a reason why the decree ought to be reversed, we will examine
these positions before proceeding further.

*First*, The answer alleges that the Alabama and Chattanooga
Railroad Company was not a corporate body, and the decree
affirms the contrary. The cross-bill states at large the reason
for the allegation of the answer. It is, that the company had
its alleged corporate existence alone in virtue of a special act
of the legislature of Alabama, passed the 17th of September,

1868, which act upon its face was a violation of the Constitution of the State, which declares that " corporations may be formed under general laws, but shall not be created by special act, except for municipal purposes." The act referred to is set out in full, as an exhibit to the cross-bill. It authorizes the Wills Valley Railroad Company (a pre-existing corporation) to purchase the railroad and franchises of the Northeast and Southwestern Alabama Railroad Company (another pre-existing corporation); and, after doing so, to change its own name to that of the Alabama and Chattanooga Railroad Company.

We are unable to see any thing in this legislation repugnant to the constitutional provision referred to. That provision cannot, surely, be construed to prohibit the legislature from changing the name of a corporation, or from giving it power to purchase additional property; and this was all that it did in this case. No new corporate powers or franchises were created.

The appellant, however, in his cross-bill alleges that fraud and collusion were practised in making the purchase of the Northeast and Southwestern Alabama Railroad, and that the proper steps were not taken to entitle the Wills Valley Railroad Company to assume the new name. It is admitted that the purchase was made and the name assumed; and it sufficiently appears throughout the record and by the laws of Alabama that the company always afterwards acted under the name so assumed, and was recognized thereby by all departments of the State government. The mortgage and bonds under and by virtue of which the appellant claims a standing in court were executed by the Alabama and Chattanooga Railroad Company as a corporation. The mortgage commences with the statement that it was made between the Alabama and Chattanooga Railroad Company, a corporation of the States of Alabama, Georgia, Mississippi, and Tennessee, party of the first part, and the trustees (naming them), party of the second part; and it then recites as follows: " Whereas, in pursuance and by virtue of an act of the legislature of the State of Alabama, approved Nov. 17, 1868, and entitled 'An Act relating to the Wills Valley Railroad Company and the Northeast and Southwestern Alabama Railroad Company,' said Wills Valley Railroad Company

has changed its name to the Alabama and Chattanooga Railroad Company." In view of these facts, we think that the appellant is estopped from denying the corporate existence of the company whose bonds he thus holds, and by virtue of which he acquires a *locus standi* in the suit. Irregularities and even fraud committed in making the purchase authorized by the act, and failure to perform strictly all the requisites for changing the company's name, cannot avail the appellant, occupying the position he does in this suit, to deny the corporate existence of the Alabama and Chattanooga Railroad Company. He waived all such objections when he took the bonds, and came into court only as a holder and owner thereof. The irregularities on which he relies might, perhaps, have been sufficient cause for a proceeding on the part of the State to deprive the company of its franchises, or on the part of third persons who may have been injuriously affected by the transactions. But neither the State nor any other persons have complained; and it is not competent for the appellant to raise the question in this collateral way, for the purpose of gaining some supposed advantage over other creditors of the same company, who have relied on its corporate existence in the same manner that he has done.

*Secondly,* The ground for impeaching the sale of the road by the assignees in bankruptcy is based on the supposed want of jurisdiction of the judge who made the order to show cause why the company should not be declared bankrupt, of the District Court which made the decree of bankruptcy, and the alleged want of notice to the second-mortgage bondholders, or their trustees, of the petition for an order of sale.

As to these proceedings (which are quite fully stated in the answer of Lindsay, one of the defendants), the appellant, in his cross-bill, admits that a petition of involuntary bankruptcy was filed against the Alabama and Chattanooga Railroad Company, in the District Court of the United States for the Middle District of Alabama, by one W. A. C. Jones; that a rule to show cause was made by Circuit Judge Woods; that the company was adjudged a bankrupt by default by the district judge; that Bailey, Gindrat, and S. B. Jones were appointed assignees; that they filed a petition in the District Court for the sale of the property; that the court granted

a rule to show cause thereon, and heard the same, and made an order of sale; and that the sale was made accordingly. The petition of the assignees, asking for an order to sell, the order to show cause why a sale should not be made, and the order of sale made thereon, are all set out in full by way of exhibits to the cross-bill. The assignees' report of sale, and the order confirming the same, had been previously filed in the cause by the complainants. With all this in the record, it is certainly difficult to see any lack of jurisdiction in the court to order the sale complained of; but the cross-bill alleges that these proceedings were irregular and void. Whether this be so, and whether it can be alleged in this collateral way, depends upon the character of the objections made to their validity. The objections made are as follows: —

*First,* That the company was not a legal corporation, and therefore the court had no jurisdiction to declare it bankrupt.

We have already considered this objection, and think it has no foundation in fact.

*Secondly,* That the proceedings were instigated by the governor of Alabama, on a pledge or promise to Jones, the petitioner, that his debt should be paid in full. We do not perceive how this fact, if true, can avoid the proceedings in bankruptcy. If the debtor should make such a promise or pledge, it would affect his discharge, but would not invalidate the proceedings. To give it that effect would operate to the injury of other creditors and purchasers interested in the bankruptcy proceedings.

*Thirdly,* It is alleged that Judge Woods had no authority to make the order to show cause; that he could not know, when he made it, that the district judge would not be present to conduct the proceedings. As the appellant has not set forth in full the order to show cause referred to, we must presume that the circuit judge acted according to law. He had full power to perform the duties of the district judge when the latter was disabled to perform them. The act of Congress of March 2, 1809 (2 Stat. 534), expressly authorized the justice of the circuit to do this, in case of the disability of the district judge to perform the duties of his office; and the act of April 10, 1869, which created the circuit judges, conferred upon them the same

power, in the circuits, as the justices of the Supreme Court had.    16 id. 44.

*Fourthly*, It is objected that no notice of the assignee's petition for a sale was given to the second-mortgage bondholders, or their trustees, although it requested a sale of the property free from the incumbrance of the second mortgage, and subject only to that of the first mortgage; but it appears from the petition itself, set forth as an exhibit to the cross-bill, that it had annexed to it a copy of both the first and second mortgages, and that it stated that the assignees were informed that there was a third mortgage; that it stated the number of bonds which had been issued under the second mortgage; that it stated and alleged that much the larger portion of the second-mortgage bonds which had been issued were in the hands of the corporators of the railroad company, without consideration or value; that the only holders and owners of said bonds known to the assignees were W. A. C. Jones (the petitioner in bankruptcy), James W. Sloss, and A. C. Hargrove, residents of Alabama, and that the others were not known to them, and that they believed they were citizens of other States, and beyond the jurisdiction of the court; that the original trustees named in the second mortgage had ceased to be such, and that, under a power in the mortgage, others had been appointed in their stead, — to wit, as the assignees had been informed, Seth Adams, Francis B. Loomis, and John C. Stanton, all residing in Boston, Mass.    It appears further, that the order to show cause, made upon said petition, was directed to be served on the said substituted trustees, and also on the said Jones, Sloss, and Hargrove, ten days before the hearing thereon.    The order of sale recites that it appeared to the satisfaction of the court that due service of the petition and order to show cause had been made for more than ten days prior thereto.    Now, although the assignees were in error as to the names of the substituted trustees of the second mortgage, yet the service on a portion of the bondholders, whose interest was identical with that of the appellant and the other bondholders, and who were the only bondholders known to the assignees, would seem to be sufficient, under the circumstances, to give the court jurisdiction to make the order of sale.    The assignees themselves represented all

creditors of every class; and if they deemed it advisable that the property should be sold, and that it ought to be sold subject only to the first mortgage, and gave notice of their application for an order of sale to all persons interested in the subsequent securities of whom they had any knowledge (such persons representing a real and substantial interest identical with that of the others who were not known), we think that the bankruptcy court had power to act upon the petition. The order of sale provided that abundant notice of the sale should be given, both in Alabama and ·elsewhere; and it is apparent, from the report of sale made by the assignees, that it was a notorious proceeding, the appellant himself attending the sale, by his attorney, and making sundry objections thereto. The defendant and other holders of second-mortgage bonds, if they had so desired, could have objected to the confirmation of sale, and it would then have been competent to them to question the sufficiency of notice and the ·jurisdiction of the court; but no such objections appear to have been made by them.

On the whole, we think that ·the objections to the jurisdiction of the District Court were not well taken, and that the sale was a valid one, even if it be a question whether, under the ·circumstances, it was so made as to cut off the second-mortgage bondholders.

But if the objections were valid, there is nothing, in reference to this matter, in the final decree of the court, which can materially injure the appellant. All the notice which the decree takes of the assignees' sale is to recite the facts of the proceedings in bankruptcy, and of the sale as it actually ·occurred. No order is made or judgment rendered in the decree which would preclude the appellant and other holders of second-mortgage bonds, in the proceedings to be instituted before the master for ascertaining the claims chargeable upon the property, from setting up their claim to any part of the surplus proceeds after satisfying the first-mortgage bondholders and the liens paramount thereto.

We have thus disposed of the principal grounds of defence taken by the appellant in his answer and cross-bill. His allegation that the State of Alabama was never liable on the indorsement made by its governor on the first-mortgage bonds,

and therefore had no right to take possession of the road, and is accountable for its proceeds whilst in the possession of its agent or receiver, and that those proceeds should be set off against its claim for interest paid, whether such allegation be well or ill founded, forms no objection to the decree made in the cause. There is nothing in the decree which affirms or disaffirms the rights of the State. Perhaps the very fact that this point was taken in the appellant's answer was the reason why the decree is silent on the subject. Whatever demands may exist in favor of or against the State remain unadjudicated, as they should be, unless the State had chosen voluntarily to submit itself to the jurisdiction of the court.

The final decree, from which the present appeal was taken, was made on the 23d of January, 1874; and it was thereby, in substance, declared, that the Alabama and Chattanooga Railroad Company was a corporation under the laws of Alabama, and that corporate privileges had been granted to it by the States of Tennessee, Mississippi, and Georgia; that the first mortgage and the bonds *bona fide* issued under it were a first lien on the property, except as therein afterwards stated; that the moneys raised by loan, or advanced by the receivers and expended on the road pursuant to their order of appointment, were a lien paramount to the first mortgage; and direction was given that it should be referred to a master to ascertain the true amount of said loan and of the bonds *bona fide* issued under the first mortgage, as well as other claims against the property. The decree further found and declared that the railroad company had been declared bankrupt by the District Court of the Middle District of Alabama, and that the said court had appointed assignees in bankruptcy; and that the said assignees, by virtue of an order of the court, had sold the railroad, and that the governor of Alabama had purchased the same on behalf of the State, subject only to the lien of the first mortgage. The decree then directed that the road and its appurtenances should be sold, as an entirety, by commissioners named for that purpose, with directions as to the manner of sale; and that, when sold, the company, and all parties claiming under it, should be barred and foreclosed of all claim thereto. It then decreed the application of the proceeds to arise from the sale,

as follows: *first*, to the payment of the trust and legal expenses; *second*, to the payment of taxes and other liens prior in law to the first mortgage, including the liabilities incurred, as aforesaid, by the receivers, and such receivers' certificates or other indebtedness as might thereafter be sanctioned or ordered to be paid by the court; *third*, to the payment of such first-mortgage bonds (with the interest thereon) as might be reported by the master to have been *bona fide* issued and yet unpaid; *fourth*, the residue, if any, to be subject to such order and priority in distribution as the court should thereafter establish and decree. It was further ordered that the master should ascertain and report the amount of said several classes of securities before the sale.

The appellant raises several objections to this decree in addition to those which have been already considered.

First, it is objected that it is variant from the relief sought by the bill. The principal gravamen of the bill, it is contended, was that the interest due on the bonds was not paid in gold; and the decree sought was, that the bondholders were entitled by the contract to be paid in gold coin. It is also alleged that the evidence was variant from the allegations of the bill in this respect. The bill alleged that the contract was to pay in coin, whereas the bonds, as shown by the exhibit annexed to the bill, were only payable in lawful money. It is argued, from the maxim that the *allegata* and the *probata* should agree, that this variance was fatal, and that the bill should have been dismissed.

It is true that the complainants do, in their bill, insist that the contract was to pay the principal and interest of the bonds in gold coin, and the point is strenuously urged as a ground for relief. But it cannot be justly said that this was the principal gravamen of the bill, or that the principal object of the bill was to establish that claim. Its main object was to secure the payment of the first-mortgage bonds (however payable), and to get possession of, and preserve from destruction, the fund out of which they were payable, and which, it was alleged, was fast being dissipated and destroyed. The leading facts on which this desired relief was based, and which were alleged and relied on, were the execution of the mortgage as a first lien on the

property, the issue of bonds secured thereby, the insolvency of the company and its failure to pay the interest, the refusal of the State to pay the interest in coin, and its refusal to pay the interest on a large number of bonds in any form, and the mismanagement and rapid deterioration and destruction of the property subject to the mortgage. These facts were all substantially admitted by the appellant in his answer and cross-bill, or clearly follow from facts which were admitted. The question about payment in coin was a subordinate one. The trustees saw the security of the bondholders fast disappearing before their eyes. They desired to save it in time, to rescue it from the hands of those who were mismanaging and dissipating it. They might be mistaken on the question of coin, but the default was sufficient without that to entitle them to the relief they sought. They asserted that view of the claim which was most favorable to the bondholders. This should not preclude them from relief if a less favorable view should be adopted by the court. The company had, in fact, by an indorsement on the bonds, agreed to pay in coin; but the court probably considered that this agreement was not binding on the State, nor on the subsequent incumbrancers, not being notified in the mortgage; and it only rendered a decree for payment in lawful money. Surely the second-mortgage bondholders cannot complain of this decision, which was in their favor; and we can see no such variance between the proofs and allegations as to render the decree technically erroneous. Whilst the complainants, in their bill, insisted that the agreement was to pay in coin, they spread the whole agreement upon the record, precisely as it was made, so that no one was misled by the form or manner of pleading. If the objection were a valid one, it might have been set up by way of demurrer, or it might have been made in the answer. But in neither of these ways did the appellant see fit to bring it to the notice of the court. We think that he cannot now complain of it as error in the decree.

The appellant argues further, however, that the indorsement by the company of an agreement to pay the bonds in coin had the effect of changing the contract as guaranteed by the State, and as entitled to priority over the second-mortgage bonds; and, therefore, that the bonds being thus changed in their legal

effect lost the benefit of the guaranty, and the priority to which they would otherwise have been entitled. This would, indeed, be a strange result. The bonds on their face, as prepared for issue and sale, promised payment in lawful money. As such, they were guaranteed by the State.  As such, they were entitled to priority over the second-mortgage bonds. The purchasers required from the company the further stipulation that it should pay in coin. Such stipulation was clearly supplemental and subsidiary, affecting only the company itself. So long as it was not recognized by the court to the prejudice of the State, or of the holders of the second-mortgage bonds, it is difficult to see how the latter could be injured by it. They could be no more injured, in a legal point of view, than if a stipulation had been made for additional security. That it could not be enforced against the common fund, to the prejudice of the State or of the second-mortgage bondholders, is conceded by the court in its decree. And in this we see no error.

The only other material objection made by the appellant to the decree, not already disposed of, is, that it declared the amount due on the receivers' certificates to be a lien on the property in their hands prior to that of the first-mortgage bonds. The history of these certificates has already been referred to. The receivers were authorized by the order appointing them, amongst other things, to put the road in repair and operate the same, and to procure such rolling-stock as might be necessary; and, for these purposes, to raise money by loan to an amount named in the order, and issue their certificates of indebtedness therefor; and the order declared that such loan should be a first lien on the property, payable before the first-mortgage bonds. The power of a court of equity to appoint managing receivers of such property as a railroad, when taken under its charge as a trust fund for the payment of incumbrances, and to authorize such receivers to raise money necessary for the preservation and management of the property, and make the same chargeable as a lien thereon for its repayment, cannot, at this day, be seriously disputed. It is a part of that jurisdiction, always exercised by the court, by which it is its duty to protect and preserve the trust funds in its hands. It

is, undoubtedly, a power to be exercised with great caution; and, if possible, with the consent or acquiescence of the parties interested in the fund. In the present case, it appears that the parties most materially interested either expressly consented to the order, or offered no objection to it. The appellant complains that it was made without due notice to the second-mortgage bondholders. But this cannot properly be alleged, inasmuch as the trustees of the second mortgage were parties to the suit, and had due notice of the application, and made no objection to its being granted. The bondholders were represented by their trustees, and must be regarded as bound by their acts, at least so far as concerns the power of the court to act, in making the order, and so far as the interest of third persons acting upon the faith of it might be affected. The appellant did not seek to be made a party to the suit until several months after the order was made; and, when he became a party and filed his answer and cross-bill, he prayed that the court would continue to hold the property by its receivers, and would continue to direct and control them in the administration thereof, without suggesting the slightest objection to the terms of the order by which the existing receivers had been appointed.

We see nothing in the case before us on which the appellant can ground any just exception, either to the original order which authorized the loan to be made, or to the decree which confirmed it and recognized such loan as a paramount lien on the fund.

Other objections of a subordinate character are made to the decree; but we are satisfied, from an examination of the grounds on which they rest, that they do not show any error therein.

*Decree affirmed.*