INVESTMENT Co. OF PHILADELPHIA *v.* OHIO & N. W. R. Co. *et al.*

*(Circuit Court, S. D. Ohio, W. D. August 17, 1888.)*

RAILROAD COMPANIES—INSOLVENCY AND RECEIVERS—AUTHORITY TO ISSUE CERTIFICATES.

The petition of a receiver of an insolvent railroad company for authority to borrow $347,577.18, and issue his certificates therefor, specified that $111,-904 of the amount was to be used in completing a portion of the road and widening its gauge, $35,000 for purchasing and laying track over another portion already graded and bridged at an expense of $49,000; $47,243.18 to pay claims for material furnished, etc., which were not a lien on the road; $20,-000 to reimburse bondholders for advances to meet arrearages of wages and avert a strike; $100,000 to purchase leased rolling stock, for which the company paid an annual rental of $28,800, the lessors also canceling a claim for $7,000 unpaid rent, if the purchase was made; $4,000 to relay a line of track on a connecting road, and thus cancel a debt of $8,000 due that road, and secure enough additional business to pay the cost in three months; and $29,-

430 to make final payment on a valuable tract of real estate. Holders of $943,-000 of first mortgage bonds and $293,000 of second mortgage bonds consented to the issuance of the certificates, the remaining holders of $257,000 first mortgage bonds and $219,000 second mortgage bonds not consenting, and a portion of them, together with other lienholders, objecting. *Held* that, it being doubtful whether the improvements would add to the selling price of the road, the petition would be denied absolutely as to the items of $35,000 and of $20,000, and as to the item of $47,243.18, except upon consent of all lienholders; but that certificates would be issued for the remaining items, if desired by the consenting bondholders, with leave thereafter to petition to have the same made a charge on the non-consenting bondholders.

In Equity. Petition of receiver to borrow money and issue his certificates therefor.

*Howard G. Hollister* and *John G. Johnson*, for complainant.

*Harmon, Colston, Goldsmith & Hoadly, C. B. Matthews*, and *Healy & Brannan*, for respondents.

*Ramsey, Maxwell & Ramsey*, for receiver.

SAGE, J. This cause is before the court upon the petition of the receiver, for authority to borrow $347,577.18, and to issue his certificates therefor. Before referring in detail to the petition, it will be necessary to state the condition of the defendant, the Ohio & Northwestern Railroad Company, and that of its road, as disclosed by the bill, the petition, and by other papers on file. The precise date of the organization of the railroad company does not appear, but it must be within about two years. The first mortgage is dated 13th September, 1886. The capital stock is $3,500,000. There are outstanding $1,200,000 first mortgage bonds, and $512,000 second mortgage bonds. The company is hopelessly insolvent, has never paid any interest on its bonded debt, is wholly without credit, and can raise no money from any source excepting its earnings, which are not, and for more than six months last past have not been sufficient, to pay its operating expenses. Its line of road is 106 miles in length, extending from Idlewild, a station on the Cincinnati, Lebanon & Northern Railroad, about 3 miles from Cincinnati, to Portsmouth, Scioto county, Ohio; but its track is laid only to Sciotoville, 5½ miles out from Portsmouth, so that the road does not reach either to Cincinnati or to Portsmouth, the terminal points. It has, however, for some time had, at heavy cost, an entrance to Cincinnati over the tracks of the Little Miami Railroad, from Batavia Junction, a distance of some nine miles; and into Portsmouth, from Sciotoville, over the tracks of the Scioto Valley Railroad. It owns no equipment, locomotives, or cars, but is operated by leased rolling stock throughout, at charges for rentals too onerous for the company to bear, or the receiver to pay. A portion of its line, extending eastwardly from Idlewild 43 miles to Sardinia, (perhaps beyond,—the papers on file do not show,) was originally the Cincinnati & Eastern Railroad, a narrow-gauge road, and was purchased at judicial sale made by order of the court of common pleas of Clinton county, Ohio. That sale was confirmed February 3, 1887; the order reserving a first lien for the deferred purchase money, of which $56,099.50 remains unpaid. The track, excepting six miles upon this portion of the line, has been widened to

standard gauge by relaying the narrow-gauge rails, which are old, rapidly wearing out, and of too light weight for use with heavy freight engines; trestles need strengthening, and generally the track is in so bad a condition as to be unsafe. Other particulars relating to the condition of the road will be referred to in considering the receiver's petition.

The receiver itemizes his petition as follows: (1) $111,904 to meet the expense of purchasing and laying steel rails of sufficient weight, of changing six miles of narrow gauge to standard gauge, and of strengthening trestles, between Idlewild and Sardinia. (2) $35,000 for rails and ties, and for laying the track between Sciotoville and Portsmouth. All the other work, including grading and bridging, has been done at an expense of $49,000. Unless completed, the right of way of this portion of the line will be forfeited, and the labor and material already expended will be lost to the company; whereas upon its completion the company will receive, under an arrangement already made, $3,000 per annum from the Scioto Valley Railroad Company, for its joint use, and will have free access to certain fire-brick works, from which the company now derives a large share of its business, but is compelled to pay 40 per cent. of its freight rate from Sciotoville to Cincinnati for use of track between Sciotoville and Portsmouth, and from $2 to $2.50 switching charges per car for all business out of Portsmouth proper. (3) The receiver asks for $47,243.18 wherewith to cash a list of unpaid vouchers for claims against the company, none of which are liens upon the road. Twenty thousand dollars of these claims are timber and ties furnished the company by parties who were induced by promises of payment to omit the steps necessary to secure statutory liens. The residue of the claims are in large part in favor of regular shippers, whose good-will is valuable, whose hostility would be injurious to the road. (4) $20,000 to reimburse large bondholders, who advanced that sum to meet arrearages of wages to employes, in December, 1887, and January, 1888, when a strike was threatened, and immediate payment was an absolute necessity. (5) $100,000 for the purchase of the locomotives and cars now used by the receiver in operating the road, and constituting its entire equipment. The annual rental of this equipment is $28,800. Allowing 6 per cent. interest on the purchase price, which is actual cost and interest, the saving to the company would be $22,800 per annum. The lessors are willing also to cancel their claims for unpaid rentals amounting, approximately, to $7,000. (6) $4,000 to cover the cost of relaying on the line of the Columbus & Maysville Railroad, which gives to the Ohio & Northwestern a connection with and traffic from Hillsboro, the perfect 42-pound rail taken up from the track of the Ohio & Northwestern. The result will be to cancel a debt of $8,000 due to the Columbus & Maysville Company, and give the Ohio & Northwestern Railroad Company enough additional business to pay the cost of the work in three months. (7) $29,430, the price of a piece of land at Red Bank, on the line of defendant company's road, six miles from Idlewild, purchased by the company; the cash payment of $9,810 for which was advanced to the company, and its note therefor taken. The company's line passes over this

tract, which is mortgaged for the deferred payments.   The land is especially valuable because of its containing a deposit of gravel available, not only for the uses of the road, but for sale.   The receiver enumerates advantages and benefits which, in his opinion, will result to the company and its creditors, by way of curtailing expenses, increasing business, enlarging receipts, and accumulating good-will; but it is unnecessary to particularize them.   The receiver files with his petition the consent to the issue of the certificates asked for of the holders of $943,000 of the first mortgage bonds, and of $293,000 second mortgage bonds; leaving $257,000 first mortgage bonds and $219,000 second mortgage bonds for which no consents are filed.   No consents of lienholders other than bondholders are filed, and it does not appear from the bill or petition whether there are any such.   The petition was filed Saturday, August 3d, and presented for allowance Wednesday, August 8th, to me, at Asheville, N. C.   How many of the non-consenting bondholders, or of other lienholders had notice, does not appear, but none of them were present in person or by counsel.   On the evening of the day when the application was presented, the Mercantile Trust Company of New York city, trustee of the first mortgage, telegraphed that it had been advised by telegram of the application, and that it objected to any order which should affect rights of bondholders not joining in the petition.   Letters also were received, one dated at Cincinnati, August 6th, from counsel representing parties there resident holding $47,500 first mortgage bonds and $97,000 second mortgage bonds, who object to the issuing of certificates.   They complain that they only learned incidentally, the evening of the day previous, the time and place of the application, to which they object vigorously, stating that "the object of the application seems to be to enter upon a general plan or scheme of enlargement of the property," and that "the only part of the application that could by any possibility be an exception to the above objection taken by us is for the laying of new rails between Sardinia and Batavia Junction."   There is also presented on behalf of contractors for building a part of the company's line of road, who object to the issue of certificates, and who claim to have a statutory lien for a portion of the amount due them for work done, an affidavit dated August 11th, setting forth, among other things, that $2,000,000 only of stock have been issued; that not a dollar has been received on stock subscriptions; and that the entire issue was parceled out between the president and board of directors, who paid nothing for it, and who still hold it.   Whatever the fact may be, it cannot be allowed to prejudice bondholders or claimants who it is not even suggested were parties to it.   The condition of the company and of the road, which has been only outlined in this opinion, from papers on file, strongly indicates, however, that, if the stock subscriptions have been paid, neither the money derived from that source, nor that from the sale or hypothecation of bonds, has been applied to the road, or to the proper purposes of the company to any greater extent than it was possible to avoid.

The power of United States courts to authorize the issue of receiver's certificates, and to make them a charge upon railroads and their prop-

erty, superior to the lien of mortgages and statutory liens, has been so frequently affirmed by the supreme court of the United States that it is not open to be questioned. But, as was said by the supreme court in *Wallace* v. *Loomis*, 97 U. S. 146: "It is undoubtedly a power to be exercised with great caution, and, if possible, with the consent or acquiescence of the parties interested in the funds." In some instances certificates for very large amounts have been authorized. In *Kennedy* v. *Railroad Co.*, 2 Dill. 448, the receiver was authorized to borrow $5,000,000, and issue certificates therefor, which were made the first lien on the road and lands of the company. But that was done at the instance of bondholders, to enable the receiver to complete the unfinished portion of the road, and prevent a valuable land grant to the company, which was the principal security to the bondholders, from lapsing. The total length of the line of the road was 700 miles, the land grant was of 10 sections to the mile, and it was admitted or shown that the average value of the lands was six dollars per acre. That was a case where there was a morally certain outcome for the road upon its completion. But what have we in the case before the court? A wrecked road, irretrievably insolvent. Its business is altogether local; and its future, even if it be put in complete running order, and furnished with an equipment of its own, altogether problematical. No certain prediction can be made. Apparently, the only thing to be done for the interest of the bondholders, whose rights are vested, and to be fully protected by the court, is to sell the road, and distribute the proceeds. If the court authorizes certificates to be issued and made a lien upon the railroad superior to the mortgages, for the purchase and laying of steel rails, for the purchase of equipment, and for the completion of the road, the result may be to cause those things to be done at the expense and to the detriment of the bond and lien holders, and for the benefit of the purchasers, or of a syndicate holding a majority in amount of the bonds and liens, having peculiar advantages as bidders, and intending to become purchasers at the sale; for it rarely occurs that improvements and betterments add to the salable value of the road anything near their cost. In this case the court cannot say that they would at all increase the bids at the sale, which, in the condition of the railroad company and of the road, is the proper test. The showing in favor of the second item of the receiver's petition, relating to the completion of the road between Sciotoville and Portsmouth, made a strong impression, at the time, upon my mind, that for that purpose certificates ought to be issued; but subsequent examination led to the conclusion that it was extremely doubtful whether, if that work were done, it would add a dollar to the selling price of the road. Moreover, objection has been made to that item since the presentation of the petition, upon the ground that the Scioto extension is entirely problematical, and that there is no certainty that the Scioto Valley Railroad Company will rent the property. That company's road is now in the possession of a receiver, who, it is reported, has taken possession of that property. The fourth item of the receiver's petition is altogether inadmissible. The receiver has no interest in it. It is his business to represent all the bond-

holders and all the lienholders, and not one or two against the others. If the parties interested wish to have that claim considered, they will have to apply for leave to file an intervening petition: The third item, relating to unpaid vouchers, and amounting to $47,243.18, is one for which the court will not, without the consent of all the bond and lien-holders, allow certificates. Two vouchers of the list will be rejected absolutely, as the court is at present advised. They amount to $2,241.42, and are for the services and expenses of the president of the Ohio & Northwestern Railroad Company, up to June 14, 1888. As for all the remaining items, under existing circumstances, the presentation of the petition having been practically *ex parte*, some bondholders and lienhold-ers and the trustee under the first mortgage objecting, others not noti-fied, and none present, or having had sufficient opportunity to be heard, the application for leave to borrow money and issue certificates to be made a charge upon the road is denied. This is the conclusion of the court upon the merits also; but, inasmuch as the holders of $943,000 first mortgage bonds, and of $293,000 second mortgage bonds, have by their consents on file signified their confidence that the granting of the receiver's petition will be advantageous to the bond and lien holders, the court will, if they desire it, authorize the issue of certificates, excepting the second item, and the two vouchers of the fourth item, which have been specified as absolutely rejected, and make them payable as prayed in the petition, excepting that they shall not be a charge upon the in-terest, or affect the lien of the non-consenting bond and lien holders. The consents on file are not sufficient; but upon the filing of consents to the issue of certificates, as above suggested, the order will be made. The court will also reserve to the consenting bondholders the right hereafter, when the books of the company shall be accessible for thorough in-vestigation, and all interested shall have due notice and opportunity to be heard, to move to enlarge the order so as to charge also the non-con-senting bond and lien holders. But that there may be no misapprehen-sion, it is to be distinctly understood that the showing must be so strong as to make it quite clear to the court that the salable value of the road is so increased by the improvements and betterments as to make it equi-table to require the non-consenting bond and lien holders to pay their ratable proportion of the cost.