CENTRAL BANK & TRUST CO. et al. v. GREENVILLE & W. R. CO.
(STATE OF SOUTH CAROLINA, Intervener).

(District Court, W. D. South Carolina. November 26, 1917.)

RECEIVERS ⊘⟶118—RAILROAD OPERATION—RECEIVER'S CERTIFICATES.

On bill to foreclose a mortgage on the property of a South Carolina railroad company, a receiver was appointed. After operation of the road for some time had been continued at a loss, train service was discontinued, on the ground that further operation would endanger the lives of crews and passengers. It appeared that the railroad had always been operated at a loss, but that no particular effort had been made to develop traffic in the territory through which it ran. Civ. Code S. C. 1912, § 3117, under which the company was organized, declares that any person, company, or corporation now running or hereafter acquiring any railroad by purchase or otherwise shall organize and put into operation such road within 60° days from purchase or acquisition. *Held*, it appearing that there was much traffic, for movement of which the operation of the railroad was necessary, and which might reasonably be expected to result in a profit, the petition of the state of South Carolina, praying a resumption of the service, should be granted, and the receiver directed to issue certificates to repair the roadbed, for not only is a railroad a public highway, but a resumption of operations would naturally, as the purchaser would be required to resume operation, result in a better price.

In Equity. Bill by the Central Bank & Trust Company, a corporation, and others, against the Greenville & Western Railroad Company, in which the State of South Carolina intervened, praying that operation through a receiver previously appointed should be resumed. Receiver's certificates directed to be issued and operation resumed.

McCullough, Martin & Blythe, of Greenville, S. C., for complainants and defendant.

Haynsworth & Haynsworth, of Greenville, S. C., for intervener.

JOHNSON, District Judge. This is a suit in equity to foreclose a mortgage, executed by the defendant on its franchises, roadbed, rolling stock, and equipment. At the institution of the suit, on motion of the complainants, defendant consenting, a receiver was appointed to take charge of the property and to operate the same. The receiver continued the operation of the road at a loss until November 2, 1917, when this court passed an order discontinuing train service, on the ground that the operation of trains endangered the lives of crews and passengers. Thereupon the state, by consent of the Attorney General, at the relation of numerous citizens interested in the continued operation of the road, filed a petition and prayed to be allowed to intervene. The intervention was allowed. The state then asked that the operation of the road be resumed, whereupon an order was issued and served upon the complainants and defendant to show cause why the operation of the road should not be resumed, and upon the coming in of the return this matter was heard.

The railway company and the bondholders introduced evidence tending to show that the revenues of the road from the formation of the

corporation in June, 1914, had at all times been less than the operating expenses; that the roadbed and trestles are in bad condition, in some places so bad as to endanger the lives of crew and passengers, if trains should run; that it would require $50,000 to put the road in good condition, and that at least $3,000 should be spent in repairs at the worst places, before it would be safe to run a train at all; that the road is without equipment, engines, cars, etc., with which to operate. Upon this showing, they ask that they be relieved of spending any more money in the unprofitable enterprise, and pray a speedy foreclosure and sale.

The state introduced testimony tending to show that the road, when inspected by the state Railway Commission in the spring of 1917, was in good condition for a road of that character, and that in August it was found in better condition, with two or three exceptions, than on the previous inspection; that the road, unless it has greatly deteriorated since August, could be operated safely, but that, in order to put it in good condition $10,000 ought to be spent right away, followed by an expenditure of $2,000 per month for five successive months, and that this expenditure, totaling $20,000, would be ample to put the road in good condition; that the present conditions along the line of road render its operation imperative, and that ample business would be furnished to make the road pay; that located on the line of road are freight-furnishing enterprises, including a granite quarry, a sand pit, a brickyard, and also a forest of 100,000 acres, from which could be cut firewood, cross-ties, and lumber in immense quantities; that for all these things the demands are unprecedented, at the highest prices ever known; that the present coal situation in Greenville is acute, and, unless the fuel supply can come from the mountains over the railroad, the people will suffer; that the government has established an artillery range at Cleveland, on the line of the road, where 2,000 men and 500 horses are to kept, the men and horses to be constantly changed, and that the artillery range will require great quantities of supplies.

Upon this showing, what shall be done? This court has no desire to take over and operate business enterprises, or to substitute its judgment for that of men in charge of business enterprises. This railway has lost money from the beginning. The owners certainly did not invest money for the purpose of losing it, but with their manner of managing it I hardly see how they could hope to make money. If the management had cultivated the virgin fields about them, there might have been a richer harvest; but with no acquaintance with the patrons, and no effort to encourage or stimulate business along the line, the result is not surprising. Railroads in these modern days create business, encourage the building of enterprises along their lines, and foster the improvement of agriculture, in order that their freight traffic may be increased.

The receiver now in charge of the road is a banker. He resides in Atlanta. He is an estimable gentleman, but he is not in touch with the people along the line of road. He is not familiar with local conditions, or in sympathy with them. He cannot leave his bank to give this railroad the attention it needs. For these reasons, without mean-

ing any reflection whatever on him, I have decided to appoint a Greenville man as coreceiver, and I shall appoint a man who not only knows local conditions, but a man who also knows railroading. What shall these receivers be required to do? Shall receivers' certificates be issued, which will be a prior lien to the mortgage debt? Shakespeare puts it in the mouth of one of his characters to say, "When I was a boy and lost an arrow, I sent another in the selfsame way." I believe that the conditions demand that, notwithstanding previous losses, the receivers shall issue a sufficient amount of certificates to put the road in condition to run trains over it; and just as soon as they can get the road in condition to run trains over it, without endangering the lives of the crew and passengers, operation should be resumed. The interests of the public make this service imperative, and I am bound to believe that such service will be equally beneficial to the bondholders. For surely, if the road is in operation or ready to operate, it will sell to better advantage than it would if idle and the property depreciating from nonuse. It should be put in operation, in order that the purchaser may understand that he is buying a railroad, a going railroad, which under the law of South Carolina shall be continued as a railroad until the Legislature shall consent for its abandonment.

Section 3117 of the Code of Laws of South Carolina of 1912, provides:

"Any person, company or corporation now running or hereafter acquiring any railroad within this state by purchase or otherwise shall organize and put into operation said road within sixty days from their purchase or acquisition thereof."

That is the law under which the defendant railroad was purchased and organized by its present owners. That is the law under which it must be sold, and under which the new purchasers must organize and operate. Persons in private business may abandon it at their whim or pleasure. Not so with a railroad. It is a public highway. It is created by the state for the public use. It exercises the state's great power of eminent domain for the public good. The Supreme Court of the United States, in Barton v. Barbour, 104 U. S. 135, 26 L. Ed. 677, says:

"A railroad is authorized to be constructed more for the public good to be subserved than for private gain. As a highway for public transportation, it is a matter of public concern, and its construction and management belong primarily to the commonwealth, and are only put into private hands to subserve the public convenience and economy. But the public retain rights of vast consequence in the road and its appendages, which neither the company nor any creditor or mortgagee can interfere with. They take their rights subject to the rights of the public, and must be content to enjoy them in subordination thereto. It is therefore a matter of public right by which the courts, when they take possession of the property, authorize the receiver or other officer in whose charge it is placed to carry on in the usual way those active operations for which it was designed and constructed, so that the public may not receive detriment by the nonuser of the franchises. And in most cases the creditors cannot complain, because their interests, as well as those of the public, are promoted by preventing the property from being sacrificed at an untimely sale, and protecting the franchises from forfeiture for nonuser. As a choice, then, of less evil, if not of the most positive good (but generally of the latter also), it has come to be settled law that a court of equity may, and in

most cases ought to authorize its receiver of railroad property to keep it in repair, and to manage and use it in the ordinary way until it can be sold to the best advantage of all interested. The power of the court to do this was expressly recognized in the case of Wallace v. Loomis, 97 U. S. 146 [24 L. Ed. 895]."

Wherefore it is ordered and adjudged and determined that V. E. McBee, Esq., be, and he is hereby, appointed as coreceiver with the present receiver, Carl J. Lewis; further ordered that the receivers immediately issue receivers' certificates, not to exceed the sum of $3,000, and that they use the proceeds thereof, or so much as may be necessary, in so repairing the roadbed, especially that north of the bleachery, as to make it safe to operate trains over the same. As soon as trains can be safely run over the road, the service shall be resumed.