EDWARD W. VANDERBILT et al., appellants,

*v.*

THE CENTRAL RAILROAD COMPANY OF NEW JERSEY AND HENRY S. LITTLE, receiver, respondent.

1. The powers of the court of chancery, and the receiver appointed by it, over insolvent railroads, are those expressly conferred by legislation, and those necessary to the exercise of the powers expressly conferred.

2. Power to turn into money the property of such a railroad for distribution among its creditors being expressly given, power to manage and preserve such property so as to realize the utmost for those concerned will be implied; and, for that end, an insolvent railroad may be operated under the control of the court of chancery, if necessary to maintain its traffic and connections, or otherwise keep it in condition to be disposed of advantageously.

3. The express power given by the act of February 11th, 1874 (*Rev. 196*), to operate an insolvent railroad for the use of the public, is not conferred on the receiver as an independent person, but as an officer of the court; the legislative intent is to extend the power to operate the railroad previously possessed, and to require its exercise for the benefit of the public.

4. When an insolvent railroad is operated under these powers, the court may control its operation, and the chancellor may personally direct or make contracts for that purpose, or he may confer a discretionary authority to make such contracts upon the receiver.

5. Contracts made by a receiver, by virtue of such discretionary authority, are, in some respects, *sui generis;* they bind the receiver, not personally, but

as the representative of the trust, and are to be enforced, or redress for their breach is to be accorded, out of the fund ; but he who contracts with the receiver does so with the knowledge that, for any injury received thereby, he can only get redress by obtaining the permission of the court, whose officer the receiver is, to sue at law, or to proceed against him in the court of chancery, and, in either case, by satisfying that court that the claim is well founded.

6. Upon an application for redress upon such contracts, the determination of the court is to proceed on equitable principles adapted to the administration of an insolvent estate of this character.

7. If, on examination, the contract appears to be improvident or detrimental to the trust, it should not be enforced, nor should damages for its non-performance be awarded. But, if the contractor made the contract in ignorance of its improvidence, and has in good faith prepared to perform it, and if, by its non-performance, he suffers actual loss, without his fault, then the fund, the representative of which has misled him, ought to re-imburse his actual loss.

8. When contracts for the purchase of goods &c. have been orally made by a receiver, deliveries to his agents empowered to examine and certify whether such goods should be accepted, and the receipt and acceptance thereof upon such examination and certificate and payment therefor, will satisfy the provision of section 6 of the statute of frauds, and the contract will bind the fund if otherwise enforceable.

Appeal from the order of the court of chancery, made upon the advice of Vice-Chancellor Van Fleet, whose opinion is reported in *Lehigh Coal and Navigation Company* v. *Central Railroad Company, 14 Stew. Eq. 167.*

*Mr. A. Q. Keasbey* and *Mr. B. Gummere,* for appellants.

*Mr. B. Williamson,* for respondent.

The opinion of the court was delivered by

MAGIE, J.

On February 14th, 1877, the Central Railroad Company of New Jersey was adjudged by the court of chancery to be an insolvent corporation, and the late Francis S. Lathrop was appointed its receiver by an order which made it his duty " to run and operate the railroads " of said company, and those owned or controlled by it.

On March 24th, 1877, upon the petition of the receiver, the

Vanderbilt v. Central R. R. Co.

chancellor made an order authorizing him, " in the exercise of a sound discretion, to continue the operation of the railroads owned or operated by the Central Railroad Company of New Jersey," and the order directed him, for that end, among other things, to contract, purchase and pay for such materials and supplies as might seem to him necessary and proper in the exercise of a wise discretion.

During the years 1880 and 1881, and particularly the last months of 1881, and the first part of the following year, Vanderbilt & Hopkins (a firm composed of the appellants in this case) claim to have received from said receiver various orders for railroad ties and lumber, which were assented to and accepted by them under contracts for the sale and delivery of the materials comprised in said order. They also claim that they were employed by the receiver to purchase railroad ties upon commission, and that they performed their duty in that respect, and became entitled to such commission. Other claims of appellants, growing out of transactions between them and the receiver, need not be specified, because they have been adjudged to be entitled to recover thereon, and no appeal has been taken from that adjudication. The appeal in this case relates to only two classes of claims, viz., those upon orders for materials, and those upon purchases made on commission.

On March 3d, 1882, the receiver died, while a large amount of these orders for materials were in progress of performance.

On March 4th, 1882, Henry S. Little was appointed receiver of the insolvent corporation, and on July 28th, 1882, by an order of the chancellor, the same powers and authority which had been conferred upon Francis S. Lathrop, as receiver, were conferred on the newly appointed receiver.

On or about June 15th, 1882, the new receiver repudiated any obligation to receive the materials which appellants claim to have been ordered, and which they were then engaged in delivering, and he refused to receive such materials as appellants then had ready to deliver, and tendered to him. Thereupon appellants filed a petition in the cause wherein the receiver was appointed, stating the facts, and praying that directions might be given to

Vanderbilt v. Central R. R. Co.

the receiver for the payment of moneys then claimed to be due, and for the acceptance of materials then ready to be delivered, and which might, from time to time thereafter, be ready for delivery under said orders. The receiver filed an answer to the petition, and testimony was taken. The petition was dismissed. The opinion of Vice-Chancellor Van Fleet, who advised the order dismissing the petition, is reported in *8 Stew. Eq. 426*. The conclusion of the vice-chancellor seems to have rested on the ground that a receiver of an insolvent corporation can make no contract which will bind the trust, unless such contract has been authorized in advance, or subsequently ratified by the chancellor, and that, unless receiver's contracts have been thus approved or ratified, the court of chancery may deal with them as to it shall appear to be just, and may either modify them or entirely disregard them. The order dismissing the petition declared that, if the transactions between the receiver and appellants were contracts, they did not bind the trust, and were improvident, and should not be enforced against the trust.

It is to be noted, that neither in the pleadings nor the opinion before referred to, was any allusion made to the order of March 24th, 1877, giving large discretionary powers to the receiver to contract for and purchase materials deemed by him necessary and proper for the operation of the road.

The appellants appealed from the order dismissing the above stated petition.

Afterwards appellants filed another petition in the same cause, setting up, among other things, that Henry S. Little, as receiver, was indebted to them by reason of the non-fulfillment of the contracts made with the former receiver, and asking leave to institute a suit at law against Little upon the claims arising out of their transactions with the former receiver. On March 3d, 1883, leave to institute such suit was granted. Thereupon suit was brought by appellants in the courts of New York. On May 11th, 1883, the order granting appellants leave to sue was vacated as improvidently made, but leave was reserved to appellants to apply for another order for permission to sue in the courts of this state.

Vanderbilt *v.* Central R. R. Co.

On May 21st, 1883, appellants filed another petition in said cause, and therein set forth their claims, which had been the subject of the former petitions, and recited the previous proceedings.    It was therein also averred that at the time appellants filed the first petition, praying that the receiver should be directed to accept the materials they were or should become ready to deliver under the orders, they were unaware· of the order of March 24th, 1877, giving discretionary power to the receiver in regard to the purchase of materials.    It was also averred that it had become apparent that the contracts under which they claimed were not improvident.    The prayer of this petition was, that an account might be taken of all the transactions of both receivers with appellants, and of the loss and damage suffered by appellants by reason of the failure of Receiver Little to fulfill the contracts made by his predecessor, and of all moneys due appellants for materials furnished and accepted, and for a decree· making such damages, losses and moneys a prior lien on the property of the company.

This petition was referred to the vice-chancellor, and the receiver was directed to show cause on June 4th, 1883, why its prayer should not be granted.    On June 14th, 1883, upon the matter coming on to be heard before the vice-chancellor, in the presence of the counsel of the appellants and of the receiver, an order was made, by the consent of the counsel of both parties, reciting that the counsel of appellants had, in the presence of the court, agreed to discontinue their suit in New York against Receiver Little; that the appeal taken by appellants from the order dismissing their first petition should be withdrawn ; that no appeal should be taken by them from the order revoking the order giving leave to sue the receiver, and that a new petition should be filed by appellants asking for any relief to which they might be advised they were entitled against Receiver Little, concerning all transactions between appellants and both receivers, with a bill of particulars showing the nature of appellants' claims ; and that all controversies between the said Vanderbilt & Hopkins and the said receiver, respecting all transactions with both receivers, should be heard upon such new petition, and such

further proceedings as might be taken thereon, in the same manner with respect to the rights of both parties as if no proceedings had been theretofore taken concerning the same. It was thereupon ordered that Vanderbilt & Hopkins should have leave to file a new petition for relief against Receiver Little, as to all matters in controversy, and the transactions with both of the said receivers, as if no proceedings had been theretofore taken with respect to such transactions.

Thereupon appellants filed a new petition in the same cause, setting out their claims arising out of transactions with both receivers, and praying for the relief asked for in the petition last referred to, and, in addition, praying that they might be decreed to be entitled to a trial by jury as to their right to recover for damages suffered by them by reason of the refusal of Receiver Little to accept the materials ordered by Receiver Lathrop, and the amount of such damages; and that they might be permitted to bring a suit at law to recover such damages, or that Receiver Little should be directed to cause an issue to be made up under the provisions of section 78 of the act concerning corporations, or that an issue should be framed to try the question of such damages. Appended to this petition was a bill of particulars of appellants' claims. Schedule I contained claims for materials accepted by Receiver Little upon orders made by both receivers, and for interest on delayed payments, and also for commissions on the purchase of ties under the direction of Receiver Lathrop. Schedule II contained a statement of damages suffered, and losses and expenses incurred by reason of the refusal of Receiver Little to accept the materials ordered of appellants by Receiver Lathrop.

To the petition last recited, Receiver Little filed an answer denying his liability for the contracts of his predecessor, and setting up, among other things, that he had given orders to appellants for furnishing materials to him as receiver, upon an agreement between them that no claims for damages were to be made by appellants on account of his refusal to accept the materials which appellants claimed had been ordered by Receiver Lathrop. The answer further claimed that he was justified in

refusing to accept the materials, because the orders under which appellants claimed were improvident, and that appellants were not entitled to a trial by jury, either under the corporation act or in a suit at law, because estopped by having filed their petition under the order of June 14th, 1883. It was further averred in the answer that the receiver had claims against appellants which ought to be taken into account, and that all the claims of appellants, except those for interest and commissions, had been the subject of negotiation between the parties, and that, having been fixed by agreement at a specified sum, it had been agreed that $13,000 should be left in dispute upon the receiver paying the balance, amounting to $29,124.33, which amount was paid and accepted as a settlement.

To this answer appellants replied, denying that they had accepted orders from Receiver Little upon the agreement that no claims for damages should be made by them by reason of his refusal to accept the materials they claimed a right to deliver under the orders of Receiver Lathrop, and denying that any settlement of their claims had been made, as asserted in the answer.

Upon these pleadings appellants applied to the court for leave to sue Receiver Little at law for the damages that they claimed to have sustained as prayed for in the petition. The application was denied. The opinion of the vice-chancellor, before whom the motion was made, is reported in *11 Stew. Eq. 175*. Three points were determined, viz.: (1) that before leave to sue would be granted in such a cause, the court of chancery would examine the circumstances to determine whether the matter could not be disposed of in that court; (2) that Receiver Little was not liable to be sued at law on the contracts of his predecessor; and (3) that whether the contracts of Receiver Lathrop bound the trust was within the exclusive jurisdiction of the court of chancery. The order denying the right to sue gave appellants leave to proceed in the court of chancery for such relief and remedy as they might be able to show they were entitled to.

The issues made by the last petition, answer and replication, were tried before the vice-chancellor, and a large amount of testimony was taken on both sides. Appellants were successful with

respect to their claims for materials delivered and accepted, and for interest on the payments which had been deferred. They were unsuccessful in respect to their claim for commissions and their claim for damages. Regarding the former claim, it was held that sufficient proof had not been made to justify its allowance; regarding the latter claim, it was adjudged that they had no right to relief in equity for any loss sustained by the nonperformance of the contracts set up in their petition, nor any remedy in the court of chancery, or elsewhere, for the recovery of any damages resulting from their breach. Their prayer for leave to sue at law, or for the framing of an issue under section 78 of the corporation act, or for an issue under the direction of the court of chancery, and all relief in respect to their transactions with Receiver Lathrop, except as to materials actually delivered and accepted, was expressly denied. The opinion of the vice-chancellor is reported in *14 Stew. Eq. 167.*

The appeal now before us is taken from the above stated decree, and challenges its correctness on both points upon which its decision was hostile to appellants. It therefore presents for consideration two questions: first, whether appellants are entitled to, and can be afforded by a court of equity, any relief by reason of the failure and refusal to accept the materials alleged to have been contracted for by Receiver Lathrop; and second, whether they are entitled to be paid from the trust their claim for commissions.

In the vigorous and able opinion upon which the decree now to be reviewed was founded, while it was admitted that the receiver had authority to make contracts for supplies reasonably necessary to enable him to perform his duties, which would be enforced in equity against the trust, it was maintained that such contracts imposed no legal duty whatever upon the succeeding receiver, and, for his refusal to perform the contracts of his predecessor, no damages could be recovered at law. It was, however, further held, that an equitable obligation rested upon the succeeding receiver to perform such contracts of his predecessor under certain circumstances, and his performance would bind the trust, but that the contracts which the succeeding receiver might thus

perform were only such as had been formally made, and showed upon their face, or indicated how he could ascertain that they were provident and judicious. The conclusion of the learned vice-chancellor, adverse to appellants' claim, was put upon the ground that the alleged contracts were not of a character that justified Receiver Little in performing them; but, on the contrary, he was justified in refusing to perform them both on that ground, and because appellants had sought the direction of the court that he should perform them, which direction the court had refused to make, from which refusal no appeal had been taken. The refusal to direct the acceptance of the materials was justified upon the case as last presented, on the ground that appellants had not shown the existence of completed contracts for the materials they sought to deliver, but that the evidence failed to show such contracts. It was further suggested that the alleged contracts were a breach of trust on the part of Receiver Lathrop, of which appellants had notice.

In coming to the consideration of the first question presented by this appeal, it must be determined preliminarily whether the appellants can be said to be barred by their own conduct from obtaining relief, if relief could otherwise be afforded them. Such a bar the court below seemed to discover in their failure to challenge, by appeal, the correctness of the refusal of the court of chancery to require the receiver to accept the materials which appellants proposed to deliver. Respondent's counsel have urged the same view in their argument. But it seems to me that the learned vice-chancellor, in his opinion, and counsel, in their argument, have misconceived the scope and force of the order of June 14th, 1883. When that order was made, the situation of the litigation was this: appellants had been refused the direction that the receiver should accept the materials they sought to deliver, and they had appealed to this court, and their appeal was still pending; the order of the chancellor, giving them liberty to sue the receiver at law had been revoked, but they were entitled to appeal from the order of revocation; the suit against the receiver, which they had brought before the leave to sue had been revoked, was still pending in the courts of New York; and

appellants had filed another petition in the cause, asking for relief, and expressly relying upon the chancellor's order of March 24th, 1877, which conferred large discretionary powers upon Receiver Lathrop, and which had not been known to them when their first petition was filed, and does not seem to have been considered by the court when it refused to direct the receiver to accept materials tendered under the contracts. It is further to be observed that, upon the appeal from the order dismissing the first petition, a stipulation of respondent's counsel had been obtained, that the order of March 24th, 1887, and the petition on which it was made, might be printed as part of the case on appeal, as fully as if they had been set forth in appellants' original petition, so that the question of authority under that order seemed likely to be presented on the appeal, although it had not been considered below.

From this recital it appears that the petition pending before the court of chancery on June 14th, 1883, presented for consideration claims of appellants for relief based upon the non-performance by Receiver Little of certain alleged contracts affecting the trust made by appellants with Receiver Lathrop. A determination of these claims required a decision as to the existence and binding force of the alleged contracts. Whether they bound the trust or the receiver, had, to some extent, been settled by that court in dismissing appellants' petition for directions that Receiver Little should accept materials tendered under them, but it was alleged that appellants, in presenting that petition, had been ignorant of and had not set up the order of March 24th, 1877, and that the determination of the court had been reached without a consideration of its effect. While that decree had been appealed from, yet it is obvious that if the petition before the court on June 14th, 1883, had proceeded to hearing, and the court had re-iterated its previous decision, appellants would have been obliged to appeal therefrom. A successful prosecution of the former appeal would not have affected an adverse decree on the second petition.

A successful prosecution of the former appeal, moreover, would have produced no practical result. The materials, which the first

petition asked that the receiver should be decreed to accept, had been otherwise disposed of, and the reversal of the decree and the making of a new decree in accordance with the prayer of the petition would have been of no further avail than to settle the principles on which the second appeal should be decided.

At this juncture of this litigation, the order of June 14th, 1883, was made. It contains an agreement of counsel which it declares to have been made in the presence of the court. That agreement recites the previous steps in the litigation, and provides that they should be thus terminated, viz., the suit in New York was to be discontinued; appellants' appeal then pending was to be withdrawn, and appellants were not to take the appeal they had a right to take from the order revoking leave to sue. The agreement further provided for a new petition to be filed by appellants asking for any relief to which they might be advised they were entitled, in respect to all transactions between them and each of the receivers, with the express statement that all controversies between the parties respecting such transactions should be heard upon such new petition, and the proceedings thereon, "as if no proceedings had been heretofore taken concerning the same." The order was made by the court in the terms of the agreement so recited.

The plain object of the agreement was to consolidate and prepare for judicial determination in one proceeding all the matters in controversy, including those then the subject of various proceedings. If any decision in the proceedings then pending stood in the way of a determination of all the controversies between the parties, the agreement contemplated a rehearing in the light of all the facts, and particularly of the order of March 24th, 1877, which seemed not to have been previously considered. To effect these objects the intent was to brush away useless and impracticable branches of the proceedings and to concentrate all controversies in a single proceeding involving every matter in dispute.

The course thus agreed on was greatly to the interest of the parties.

When this agreement was ratified by the order of the court,

appellants presented their whole case to the court under a new petition and at great labor and expense.   At the termination of the contest they were met with the declaration that the order, so far as it had persuaded them to submit their claims for relief upon the alleged contracts, which the court had previously, by decree, refused to direct Receiver Little to perform, was a nullity and to be disregarded.   They were told that they were bound to submit to or appeal from that decree.   In other words, appellants were considered to be debarred from any relief because they did not prosecute, but withdrew an appeal which, by a solemn agreement ratified by the court, they were bound not to prosecute, but to withdraw.

I have failed to discover any reason why such an order, under similar circumstances, might not be made in any cause pending in a court of equity.   I think it would be a reproach upon the system which administers equity to hold that a court of equity could not, in proceedings between the same parties, involving the same questions, eliminate useless litigation and concentrate all controversies in one proceeding.   Such a course seems peculiarly appropriate to proceedings of this nature, where suitors approach the court for relief respecting a fund in the hands of an officer of the court and managed under its direction.

But, at all events, the determination that the court would not direct the performance of the alleged contracts, could only operate as *res judicata* in that court in respect to claims based on the non-performance of these contracts.   If, on the rehearing contemplated by the order, the new facts elicited failed to change the judgment of the court, the new decision would conform to the former determination, but would be open to review on appeal. If no appeal from the former decree had been taken, there was nothing to prevent the petitioners, under their last petition, from demanding the judgment of the court on the question at issue, and from reviewing that judgment by appeal.

The withdrawal of the appeal simply left the proceedings as if no appeal had been taken.   For it is not contended, and there is nothing in the case to indicate, that such withdrawal induced the receiver to take any course detrimental to himself or to the trust.

Vanderbilt *v.* Central R. R. Co.

His consent to the withdrawal was with the design to have the question again presented and adjudicated upon.

For these reasons I think nothing prevents appellants from obtaining any relief to which they show themselves entitled, under their petition filed in pursuance of the order of June 14th, 1883.

It becomes necessary, therefore, to determine whether appellants have shown themselves entitled to any of the relief they claim under that petition, in respect to the refusal of Receiver Little to accept materials which they proposed to deliver under contracts alleged to have been made by them with Receiver Lathrop.

To reach a just determination of that question, it is obviously necessary to settle: what are the powers of receivers of insolvent railroad corporations; whether the transactions between appellants and Receiver Lathrop were of the nature of contracts, and if so, how they are to be enforced, or what relief can be accorded for their breach against the trust and its subsequent receiver.

The powers of the court of chancery, with respect to insolvent corporations, have been conferred by statute. Authority in this regard was formerly conferred by the provisions of the "Act to prevent frauds by incorporated companies," approved April 15th, 1846. *Nix. Dig. 404.* The provisions of that act have been mostly included by the revisers in the "Act concerning corporations," approved April 7th, 1875. *Rev. p. 174.* Some supplements to the first-named act, however, were not incorporated in the corporation act. One supplement, approved March 17th, 1870, which gave express powers to the court of chancery to deal with insolvent railroad corporations and to lease or sell their property, was not included in the corporation act. *Rev. p. 1281.* Another supplement, approved February 11th, 1874, was also not included. *Rev. p. 196 § 106.* But these acts seem not to have been repealed. No question has been made but that by these and other statutes there has been conferred upon the court of chancery the same general powers over an insolvent railroad corporation which have been conferred on it over other insolvent corporations. In general, these powers are such as suffice to enable the

assets and property of the corporation to be turned into money and distributed among the creditors. These powers are to be exercised by a receiver, under the control of the court.

Without other express authority, it is plain that for the proper performance of the duties thus imposed on the court, and to be performed by its officer, the latter must take charge of all the property of the corporation, and so manage and preserve it as to enable it to be disposed of most advantageously. With respect to the property of ordinary corporations, this duty can be fully performed by merely storing, insuring and otherwise guarding the property and preserving its value until a sale can be judiciously made. Ordinarily, as was well observed by the vice-chancellor, there is no necessity or propriety in continuing the business of such corporations, and an early conversion of their assets into money, and its distribution among the creditors, is the plan of wisdom. But if the business of an insolvent railroad be arrested and its operations stopped, it is clear that its property would not be preserved in a condition likely to realize its full value. On the contrary, a cessation of its business would be fatal to the interests of all concerned. In the absence of any express enactment, it seems to me the legislation which gives authority to deal with and convert into money such property, must be held to give, by implication, all needful authority to so run the road as to preserve its traffic and connections. The duty imposed requires the road to be so managed that, when ready to be disposed of, the lessee or purchaser will acquire, not merely the road-bed, rails, locomotives and cars, but a going concern actually engaged in business. This view of a receiver's powers and duties was taken by the supreme court of the United States. *Barton* v. *Barbour, 104 U. S. 126* ; *Wallace* v. *Loomis, 97 U. S. 146.*

Legislative authority has also been conferred in this direction. By the act of February 11th, 1874, before alluded to, it is provided that if the property of an incorporated railroad company has passed into the hands of a receiver, under the order of the chancellor in an insolvent proceeding, the receiver shall operate the road for the use of the public, subject to the order of the

chancellor.   The authority which I have found to be implied
from the previous legislation, and which extended to the running
of the road, if necessary to preserve its value, in the interest of
the parties concerned, is evidently enlarged by this legislation so
that the road may be operated in the interest and for the use of
the public.

What is the nature and scope of the authority thus expressly
conferred ?   Is the receiver constituted a statutory agent, and
empowered to do with the railroad what he thinks is proper for
the public interest, unless restrained by the express order of the
chancellor ?   Or is the power conferred upon the receiver, as a
mere officer of the court, to be wielded under its direction ?
The implied power to manage the railroad so as to preserve its
value, is manifestly conferred upon the officer of the court, who
is therein subject to the direction of the court.   When this
power is enlarged, it would be most unlikely that the legislature
would have designed to confer upon the receiver any separate
and independent authority, which he might exercise, unless re-
strained by the chancellor.   For in that case, unless the chan-
cellor should restrain the receiver from managing the road other-
wise than as he should order, it is obvious that there would be a
clashing of authority.   A construction bringing about such a
result could only be accepted if necessary.   But when the whole
legislation is considered, it seems to me that, by the obvious con-
struction of the statute of 1874, the power to operate the railroad
for the use of the public has been conferred on the receiver, as
an officer of the court, to be exercised by him, not independently,
but under the directions, and, as the act expressly declares, sub-
ject to the orders of the chancellor.   My conclusion is, that there
is nothing in this legislation giving to the contracts of a receiver,
in running a railroad for the use of the public, any greater force
than contracts made by a receiver for the preservation of the
property of an insolvent railroad.

On the other hand, I cannot find in the legislation in question
any countenance for the notion that the contracts of a receiver,
made under either the implied or express authority conferred,
may be revoked or annulled at pleasure by the chancellor.

Doubtless the chancellor has power to retain in his hands the administration of such a trust, and to personally direct and order each contract into which the receiver should enter. But it would obviously be impracticable to adopt such a course in running a railroad. To select and employ the necessary subordinates, to fix the term of service and the amount of wages, to contract for and purchase materials and supplies, and to anticipate in these respects the future needs of one of these gigantic corporations by express orders in each case, would require the whole time of the chancellor, and could never have been intended by this legislation. It must have been contemplated that in the performance of these multifarious duties some degree of discretion might be accorded to the receiver. Whether a power to exercise such discretion would not be assumed to exist in every case without a special order, need not be considered, for it is clear that the chancellor may accord such discretionary power to a receiver by a general order—such as was made in this cause.

When a receiver has thus acquired discretionary powers to operate an insolvent railroad, his position is peculiar, and the contracts he makes for that purpose are *sui generis.*

Such a receiver is not exempt from liability to answer for injuries inflicted by the wrong doing or negligence of those he employs in operating the railroad. Yet the liability is not a personal one, but only falls on the receiver as the representative of the property and fund managed by the court, and damages recovered for such injuries are to be thus collected. Yet upon such liability no suit can be brought except by leave of the court which appointed the receiver. Such leave, however, cannot be denied, unless the claim appears manifestly unfounded and vexatious. *Palys* v. *Jewett, 5 Stew. Eq. 302 ; Little* v. *Dusenberry, 17 Vr. 614.*

Analogous principles should be applied to those acts of a receiver which constitute contracts with third persons in the operation of an insolvent railroad in his charge.

The liability of a receiver upon such contracts is not personal, but as a representative of the trust. The enforcement of them, or the payment of damages for his non-performance of them, must

fall primarily upon the property and fund in the hands of the court.

Relief upon such contracts must in all cases be originally pursued in the court of chancery. If the appropriate remedy is equitable, the court of chancery will be invoked to act in the ordinary mode. If the appropriate remedy is legal, the leave of that court to sue the receiver at law must be sought and obtained, and that leave will not be denied unless the claim appears to be without foundation.

In whichever mode the court of chancery is approached, it is obvious that the first question to be determined is whether, if the alleged contracts exist, they are of a character to entitle the party applying to the relief asked. This determination is not to be reached upon the theory that the chancellor can disregard or annul such contracts at pleasure, but upon equitable principles applied to the management and winding up of an insolvent estate of this peculiar character.

If the contract has been completely performed, and its performance accepted by the receiver, and the claim is merely for compensation, relief of that nature would seem necessarily to be awarded, unless the applicant should appear to have dealt fraudulently or collusively with the receiver, to the detriment of the trust. Even if, in the judgment of the chancellor, the contract was improvident and unreasonable, unless the contractor should appear to have contracted with notice of the improper character of the contract, no just reason could be given for debarring him from the agreed-on compensation, which the receiver might, for his negligence or misconduct, be required to repay to the fund.

But if the contract has not been performed, and the applicant seeks a direction for its performance, or damages for its non-performance, what course is to be taken if the contract be found to be improvident and unreasonable, although it does not appear that the contractor had notice that it was of that character? In such case, to direct the performance of the contract, or to award damages for its non-performance, would injure and despoil the trust for the mere benefit of the contractor. The course of equity,

under such circumstances, seems plain. The contractor with a receiver must be assumed to know that if he seeks to enforce his contract, it must come under the scrutiny of a court of equity, and if it there appears to be injurious to the trust managed by that court, it would be impossible for that court to carry it out. He cannot complain, therefore, if the court decline to direct such a contract to be performed, or if it has been repudiated by the receiver, to award damages, in the ordinary sense of the term, for its non-performance.

But if the contractor has, in good faith, entered into a contract with a receiver clothed with discretionary powers, and, before the unreasonableness or improvidence of such contract has been brought to his notice or judicially determined, has made preparations for its performance, and has therein expended money or contracted obligations, which, if the contract goes unperformed, he cannot, with reasonable diligence, be re-imbursed or protected against, then it would be obviously inequitable to turn him away to submit to such loss, or to leave him to such redress as he might be entitled to against the receiver. If he has acted in good faith, then, although he may not be entitled to enforce his contract, because the receiver has acted improvidently, yet he ought not to be allowed to suffer actual loss, but should be made whole, and since the receiver merely represents the fund, he should be made whole out of the fund. If the conduct of the receiver required it, the court might compel him to re-imburse the fund for what would thus be taken from it.

An observation may be here made respecting the scope of the statutes affecting insolvent railroads, which will afford an illustration of the view I have taken of contracts made with a receiver, and the duty of the court in relation thereto.

By those statutes, the primary duty imposed upon the court of chancery is that of winding up the corporation and disposing of its property for the benefit of its creditors. The operation of the railroad is, obviously, merely auxiliary to that duty. Nothing in the legislation justifies the retention of an insolvent railroad in the hands of the court for any longer period than is reasonably necessary to enable its assets to be converted into money to

Vanderbilt *v.* Central R. R. Co.

the best account, in one of the prescribed modes, and for the benefit of those concerned. Any discretionary power conferred on a receiver must be affected by this limitation on the power of the court.

If, then, a receiver should enter into a contract for supplies to be furnished for a period so extended as to be manifestly greater than required for the performance of the statutory duty, and the contractor should apply to the court for relief, he would properly be denied any advantage from a contract which was, and must have appeared to him to be, unreasonable. So, if a contract for supplies was made for a period not otherwise unreasonable, but it was then, in fact, known to the receiver and contractor that the disposition of the railroad by lease or sale, or its release from the receivership, was imminent, a like result would follow. No relief would be afforded on a collusive contract detrimental to the trust. But if, in making such a contract, the contractor was ignorant that the power of the receiver was about to be terminated, and proceeded in good faith to prepare to perform the contract, then, although the court could not compel its performance, and ought not to award damages from the fund for its non-performance, yet, on the contractor's claim for relief for an injury suffered by the miscalculation or misconduct of the representative of the trust, the court ought, out of the trust fund, to indemnify him against actual loss.

Much of the argument before us was devoted to a discussion of the mode in which damages, resulting from the refusal of one receiver of an insolvent railroad to perform a contract made by a previous receiver, could be properly claimed and judicially ascertained. Ordinarily, an action at law for such damages is the appropriate, and, indeed, the peculiar remedy. The contention is, that the succeeding receiver could not be proceeded against at law, because he is not legally bound thereupon, either as a maker or as the representative of the maker. In other cases the court of chancery has adopted this contention, and has entertained bills in equity against the receiver in this case, founded on the breach of contracts made with Receiver Lathrop, and has thereon assessed damages, upon the ground that the contractor

was otherwise remediless.   *Kerr* v. *Little, 12 Stew. Eq. 83 ; S. C., 15 Stew. Eq. 528.*

The view taken of the case before us renders it unnecessary to decide this question, and I mention it only to disclaim any infer-. ence that this course of practice is approved.   If the claim upon such a contract ought to be determined in a court of law or by jury, I see no reason why this right should not be granted, either by giving leave to sue the present receiver at law, and by inter- dicting him from setting up any defence on the ground that the contract was not made by him, and requiring him to admit a liability thereon to the same extent as if it had been made by himself, or by directing an issue at law out of the court of chan- cery.

It is next necessary to examine the claim of appellants, and to determine whether they are of such a character as to entitle them to the relief they claim, or to any relief.

Appellants claim as holders of various orders issued in behalf of Receiver Lathrop, and requiring them to deliver various materials for the use of the insolvent railroad in his charge.   The orders on which the original petition was filed were thirty in number ; but the bill of particulars, attached to the petition now under review,· omits three of that number, and presents only twenty-seven for consideration.   Of these, one was dated Janu- ary 3d, 1880 ; six others were dated April, 1881 ; five others were dated in various months of the autumn of 1881 ; the re- mainder were dated in the early part of 1882.   Upon the face of each order there is a requirement that appellants should furnish to Receiver Lathrop certain specified materials.   In many cases the prices at which the materials were to be furnished are not embraced in the order.   In but few instances is any time fixed in the orders for the delivery of the materials.

The mode in which these orders came into the possession of the appellants has been detailed in the evidence of Edward W. Vanderbilt, one of the firm of Vanderbilt & Hopkins.   Although some doubt was originally expressed in the court below as to the admissibility of this witness to testify to transactions which he had, in behalf of his firm, with the deceased receiver, the doubt

was finally resolved in favor of the admissibility of that evidence, and no question has been here raised as to the correctness of that ruling.    It seems clear that the statute on this subject does not exclude such evidence, except in cases where one of the parties sues or is sued in the capacity of a representative of a deceased person.    *Hodge* v. *Coriell, 15 Vr. 456 ; S. C., 17 Vr. 354.*    Upon Vanderbilt's evidence, the course of business pursued by the receiver with his firm (as well as with a previous firm, of which Vanderbilt had been a member, and which had been succeeded by the firm of Vanderbilt & Hopkins) was as follows :    When materials of the sort dealt in by these firms were, in the judgment of the receiver, acting upon the report of the heads of departments or other officers of the road, or upon his own knowledge, deemed to be likely to be required, application would be made to the firm then in existence to fix a price at which such materials would be furnished by it; if the price made was satisfactory to the receiver, he would agree to take from said firm the materials so required, at the prices agreed on, and would thereupon direct, either personally, by an oral or written direction, or by message sent through one of the firm, the purchasing agent in his employ, to issue to the firm a written order, stating in detail the kind and amount of the materials which had been the subject of the proposal on the part of the firm, and the acceptance of the receiver.    Vanderbilt's testimony, respecting the general mode of transacting this business, and the particulars of the orders in question, seems to be so corroborated by the evidence of the purchasing agent and other circumstances of the case, that although he testifies with respect to a transaction with a deceased person, and his evidence ought, for that reason, to be scrutinized with the greatest care, I feel constrained to believe that the transactions he has narrated are substantially those which took place between him, representing his firm, and the receiver.

If credence, therefore, be accorded to the testimony, as thus corroborated, we have the receiver contracting with appellants for the sale and delivery of certain articles at specified prices. It does not seem that the time for delivery was in general made a term of the agreement, but it does appear that the orders

44

usually related to the anticipated needs of the road for the approaching year or season, a fact apparently known to both parties. I do not understand, from the evidence, that the orders were intended by the parties to form their contracts, or to be evidence of the whole contract. This seems clear from the fact that many of them entirely omitted one term of the contract of the greatest importance, namely, the price. Furthermore, the orders do not, upon their face, purport to be contracts, nor do they directly bind the firm for the delivery of the materials ordered. However injudicious and unbusiness-like such transactions were, I think the evidence shows that the parties actually made oral contracts for the purchase and sale of the materials specified in the orders, at prices agreed on, but sometimes not expressed in the orders, and without, in general, any specific agreement as to the time of delivery, but with knowledge on the part of the firm of the time when the materials were to be used.

In the court below, it seems to have been concluded that the evidence failed to establish completed contracts on the part of the receiver. It was suggested that the orders were more probably mere indications on the part of the receiver of the probable needs of the road for the ensuing season for the benefit of the contractors, who might thus prepare themselves to make subsequent offers for the delivery of the materials when they should be needed. I am unable to perceive any such indication in the circumstances. Many of the orders were for the delivery of railroad ties of various sorts, and it seems clear from the evidence that to prepare for the delivery of such materials, the ties had, to a large extent, to be manufactured. Moreover, many of the orders required materials to be cut into specified lengths and sizes, and there is evidence that after they had been so prepared they were not readily salable to other parties. Under these circumstances it seems to me that the orders themselves furnish a strong proof that completed contracts between the parties had been made. For otherwise the preparation of the materials in conformity with the terms of the order would be an act of gross folly on the part of appellants, because the receiver might, at his own will, refuse to buy the materials when prepared. On the other hand, it seems

Vanderbilt *v.* Central R. R. Co.

equally absurd for the receiver, after issuing such orders, to remain in ignorance whether he would be able or not to procure the articles ordered as they should become necessary. All these circumstances seem to me most persuasive evidence that actual contracts were entered into between the parties for the materials specified in the various orders. That the course taken was unbusiness-like, and not such as should be adopted, must be admitted, but the evidence, in my judgment, clearly establishes that such a course was taken.

Assuming these to be contracts for the sale of goods, each of them being for a price above $30, they are affected by the provisions of section 6 of the statute of frauds. *Rev. p. 445.* But the bill of particulars claims, and the evidence shows, that, upon each of the orders indicating the materials which were the subject of these contracts, except four, some part of the materials has, within the true meaning of that section, been accepted and actually received by the buyer. Such acceptances and receipts occurred both during the lifetime of Receiver Lathrop, and after the appointment of Receiver Little. The latter emphatically denies that he had any personal knowledge that the materials accepted were delivered on account of these contracts. But the contracts had been entered into with his predecessor as representative of the property. He had succeeded to that representation. Acceptance, as contemplated by the section in question, may be the act of an agent having authority for that purpose. *Brown on Stat. of Frauds § 327; Outwater v. Dodge, 6 Wend. 397; Allard v. Greasert, 61 N. Y. 1; Barkley v. Rens. & Sar. R. R., 71 N. Y. 205; Snow v. Warner, 10 Metc. 132; Simmonds v. Humble, 13 C. B. (N. S.) 258; Morton v. Tibbett, 15 A. & E. (N. S.) 428; Bushell v. Wheeler, 8 Jur. 532, 69 E. C. L. 442.* Both of the receivers, the evidence shows, had officers and agents charged with the duty of examining materials offered, certifying to their being proper to be received, and receiving such materials. Such agents did examine the materials offered, did certify to their correctness, and did actually receive them. The orders in question were on record in a book kept by one officer of the receiver; the bill rendered with each delivery specified upon which order the de-

livery was made; the certificates of correctness were put upon or appended to these bills, and it may be added that in very many instances the bill so made and certified was paid by the disbursing agent of the receiver. It would be disastrous in the extreme to the operation of an insolvent railroad, if contracts in existence at the time of the departure from office of one receiver, by death, resignation or dismissal, and the advent of a new receiver, must be held to be, *ipso facto*, at an end, and that no contracts are thenceforth to bind or benefit the fund, except such as should be made or ratified by the new receiver. Such an adjudication would deprive receivers of the power to obtain fair contracts. Nor is there any reason for such a doctrine. These contracts are not personal, but representative. They are designed to bind, and may well bind the fund, not only through the receiver who makes them, but also through the receiver who succeeds to his responsibilities and duties. Upon these grounds I do not think it can be doubted but that the acts of these agents or receivers—which would affect them individually if the contracts had been made in that character—will thus bind the fund which was represented by these receivers.

I have thus been led to the conclusion that completed contracts existed between Receiver Lathrop, representing the fund, and appellants, which, though not expressed in writing nor signed by the person to be charged, are yet enforceable contracts, because some part of the materials, which were the subject of each contract, has been accepted and received, and that such contracts bind the fund, through the present receiver as its representative.

The orders on which no delivery was made, as shown in the bill of particulars, are Nos. 1786, 2173, 2175 and 2176.

The contracts which thus existed and were in the course of performance by appellants were, after a time, repudiated by Receiver Little, and deliveries tendered thereon were rejected. It becomes necessary, therefore, to determine, on the principles before stated, whether appellants had a right to require their performance, or now have a right to redress for their non-performance.

A defence to appellants' claims, made prominent in respond-

ent's answer, was that they had been settled by an accord and satisfaction between the parties. The weight of evidence, in my judgment, is that the settlement set up did not include the claims in question.

There is nothing to justify the belief that the contracts in question in this case were fraudulent or collusive. Nor can I perceive sufficient ground to charge appellants with a knowledge of their being unreasonable or improvident. It is true that several of the contracts under which they make claim have remained unperformed for a long period of time, but there is nothing to show that this delay was contemplated by the parties or included in the terms of their contracts. As to the contracts made during the late fall of 1881 and the early winter of 1882, it appears in the case that, on January 27th, 1882, the Central Railroad Company petitioned the chancellor for the discharge of the receiver and the return of the road to the company, on the ground that it was no longer insolvent. To that petition the receiver filed an answer, and the proceeding was pending at his death. It thus appears that, within a few weeks after the receiver had entered into contracts with appellants for large quantities of materials, aggregating in price several hundred thousand dollars, the condition of the insolvent corporation was conceived to be such as to justify an application to relieve it from insolvency. But I find nothing in the evidence justifying the belief that the appellants had any knowledge of this condition of affairs. On the contrary, Vanderbilt, who transacted the business with the receiver, testifies that he knew nothing of the application, and had no intimation that it was about to be made. If such knowledge had been shown, a serious question would have been raised as to the *bona fides* of his conduct in entering into contracts of such magnitude at such a time. It may be added that the subsequent history of the proceedings, as it appears in this case, clearly indicates that the road was not ready to be relieved from the control of the court and the receiver, and it was, in fact, continued in the hands of Receiver Little for a long period afterwards.

A careful scrutiny of the evidence has finally convinced me that these contracts, on the part of Receiver Lathrop, were,

under the circumstances, so ill-advised and injudicious as to be properly considered and dealt with as improvident. At the time they were made, the road had been in his hands for more than four years. It must have been apparent that the time was rapidly approaching when the trust must be wound up, either by the road becoming solvent, or by its disposition for the payment of its indebtedness. Some of the orders were made after the petition for the discharge of the receiver · had been filed. Moreover, assuming that the receiver calculated that the road would remain in his hands for the ensuing year, over which these contracts were evidently designed to extend, the weight of the evidence is that the materials contracted for were largely in advance of the real needs of the road, or of any needs which might be reasonably anticipated.

The result is that the refusal to direct Receiver Little to continue to perform these contracts was correct, and appellants cannot claim any redress by way of damages for their non-performance.

Are they, then, remediless? If entitled to any relief, the general prayer in the petition will justify such relief being accorded to them.

As before remarked, there is nothing in the evidence to show that appellants had any notice of the improvident character of the contracts. Nor do I think that there is anything to justify the conclusion that the contracts were not made in good faith. It is true that the materials contracted for were enormous in amount and value. Whether such materials as were contracted for would be needed, was, to some extent, a question of judgment. Looking at ·the circumstances as afterwards developed, the learned vice-chancellor concluded that the orders were in excess of any needs that might be reasonably anticipated. This court, on review, finds that conclusion sustained by the weight of evidence. But the discrepancy between what needs might have been reasonably anticipated, and the orders given, is not so gross as to justify an inference of fraud or bad faith. It may all be well attributed to neglect in obtaining information as to such needs, or to the exercise of a careless and ill-advised judgment

by the receiver on the information obtained. But there is nothing to indicate that appellants were at all affected by these errors of the receiver.

When Receiver Little refused to perform these contracts, appellants had expended considerable sums of money in preparations for carrying out the contracts on their part. Materials which they had prepared, and which they tendered for delivery, were rejected; preparations for getting out materials, which were to be tendered for delivery on the contracts, had considerably progressed. It was, of course, the duty of appellants to take every reasonable precaution to preserve themselves from loss. But if, after taking every reasonable precaution for that purpose, they have been left out of pocket by their attempt, in good faith, to carry out these contracts, I think they are entitled to be made whole therefor. They will not be entitled to damages, nor to such profits as they would have made if the contracts had been enforced or carried out; but they will be entitled to be made whole for such loss as has fairly fallen upon them by reason of such acts as they did in preparing to perform these contracts up to the time the contracts were repudiated. For such amount they should be compensated out of the fund.

My examination of the evidence convinces me that the amount of such compensation cannot be properly ascertained and adjudicated by this court, and it seems necessary to remand the case to the court below for further proceedings. In my judgment, so far as this point is concerned, the decree below should be reversed, and a decree made establishing the right of appellants to the measure of relief hereinbefore described, with directions that the amount of the compensation to which they will be entitled shall be ascertained, either by a rehearing or by a reference upon the testimony already taken, and such additional testimony as the parties may produce.

It remains to consider whether the decree below is erroneous in rejecting the claim of appellants for relief, in respect to the commissions for their services in purchasing ties for the road, pursuant to an alleged agreement with Receiver Lathrop. The rejection was put upon the ground that appellants had failed to

make sufficient proof of any bargain between them and that receiver for such commissions. Upon examination of the evidence on this subject, I cannot say that the conclusion reached below appears to be so clearly wrong that it ought to be reversed. The decree, in this respect, must stand.

Appellants will be entitled to the costs in this court.

DIXON, J. (*dissenting*).

I think that the decree appealed from should be reversed, but not for the reasons stated in the opinion of the majority of this court.

The statute under which Receiver Lathrop was acting provides " that whenever any incorporated railroad company in this state shall become insolvent, and the property of such company shall have passed into the hands of a receiver by order of the chancellor, * * * the receiver shall, and he is hereby empowered to operate said railroad for the use of the public, subject, at all times, to the orders of the chancellor; and all expenses incident to the operation of said railroad shall be a first lien on the receipts, to be paid before any other encumbrance whatever." *Rev. p. 196 § 106.*

I regard this law as conferring directly upon the receiver the power to operate the railroad in his possession, and consequently, to make all contracts necessary for its operation. Although, in the exercise of this power, the receiver is subject to the orders of the chancellor, yet the power is derived, not from the chancellor, but from the statute, and, unless there is some order of the chancellor to curtail it, the power is as broad as the terms of the act make it. I see no adequate reason for placing this power upon a footing different from that upon which derivative powers to contract stand generally, and I therefore think that all dealings of the receiver which have the form of contracts, which are free from fraud, and which are within the scope of his statutory power, are valid contracts, and possessed of the usual incidents of contracts.

The petition in the present case sets up no equitable grounds for substantial relief, but relies upon the dealings between the

petitioners and the receiver as legal contracts. Whether such contracts were made, whether they were broken by the receiver, and what damages should be awarded to the petitioners as compensation for such breaches, are legal questions which should be settled in actions at law, according to legal rules.

I think, therefore, the chancellor should have directed such actions to be brought, and if there was any technical difficulty in the way of maintaining them against Receiver Little, who succeeded Receiver Lathrop (which I do not believe), he should have directed Receiver Little to waive the objection.

To hold that receivers of this class must go into the market for railroad supplies, with the understanding that the fairness of their contracts must be demonstrable to the chancellor whenever they are brought into question, or else they will not be obligatory upon the receivers, or with the understanding that, on breach by the receivers of their contracts, the other contracting parties shall only be indemnified against actual loss, and shall not have such damages as they would be entitled to recover from other delinquent purchasers, seems to me to be a doctrine without solid foundation, either in reason or policy.

*Decree unanimously reversed.*