UNITED STATES & MEXICAN TRUST CO. et al. v. BEATY et al. *

BEATY et al. v. UNITED STATES & MEXICAN TRUST CO. et al.

(Circuit Court of Appeals, Eighth Circuit. February 16, 1917.)

Nos. 4550, 4552.

1. RECEIVERS ⬤⟿158(2)—CLAIM—PREFERENCE—SUPPLIES FOR OPERATING.
Where receivers, appointed in a suit to foreclose a mortgage on a railway and ordered to continue the operation of the railway, used in such operation coal delivered to the railway company prior to the receivership, the seller is entitled to the payment of the contract price for such coal out of the proceeds of the sale of property and in preference to the payment of the secured bonds, there being no income or revenue derived by the receivers from the operation from which such claim could be paid, especially where the trustee representing the bondholders asked for the appointment of the receivers, because the railway company was insolvent and unable to pay for the necessary supplies to keep its road in operation, and requested the court to take possession of the railway and operate it to relieve it from being presently compelled to pay its debts for supplies before it could arrange for the payment of all its obligations.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. § 303.]

2. RECEIVERS ⬤⟿160—CLAIMS—PREFERENCE—DEBTS FOR SUPPLIES.
Claims against a railroad company for coal furnished to and used by the railroad for operating its trains and shops during the period shortly before the appointment of receivers are not entitled to preference over the bonds, where there had been no revenue received by the railroad company above its operating expenses which it had diverted from the payment for supplies to the benefit of the bondholders.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 309, 310.]

3. RECEIVERS ⬤⟿158(2)—CLAIMS—PREFERENCE—DEBTS FOR SUPPLIES—REVENUE.
The fact that the railroad company, indebted for coal furnished to it shortly before receivers were appointed, had rendered services to a subsidiary corporation for which no payment was received and which, if they had been paid for, would have given the railroad a surplus of revenue over operating expenses sufficient to pay for the coal, does not entitle the claim for coal to a preference over the bonds, though the bonds of the subsidiary corporation were pledged as security for the bonds of the parent company.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. § 303.]

Appeal from the District Court of the United States for the District of Kansas; John C. Pollock, Judge.

Suit by the United States & Mexican Trust Company and others against the Kansas City, Mexico & Orient Railway Company and others, in which W. E. Beaty and another, as receivers of the Sans Bois Coal Company, intervened and claimed a preference right to the payment by the receivers of the railway company of interveners' claim for coal furnished the railway company in preference to the bonds secured by mortgage to the complainant. From decrees allowing part of the claim as a preference, and denying a preference for the balance, both parties appeal. Affirmed.

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Rehearing denied May 29, 1917.

Samuel W. Moore, of Kansas City, Mo. (Samuel Untermyer, of New York City, on the brief), for appellants in No. 4550 and for appellees in No. 4552.

A. C. Dustin, of Cleveland, Ohio (C. E. Warner, of Ft. Smith, Ark., on the brief), for appellees in No. 4550 and for appellants in No. 4552.

Before ADAMS, Circuit Judge, and REED and ELLIOTT, District Judges.

REED, District Judge. These cases arise in the foreclosure proceedings against the Kansas City, Mexico & Orient Railway Company et al., in which the case of Chicago & Alton R. R. Co. v. United States & Mexican Trust Co. (this complainant) et al., 225 Fed. 940, 141 C. C. A. 64, and the case of Martin Metal Manufacturing Co. v. United States & Mexican Trust Co. et al., 225 Fed. 961, 141 C. C. A. 85, arose. In this proceeding W. E. Beaty and W. E. Crane, as receivers of the Sans Bois Coal Company (which will be called the Coal Company), a corporation engaged in mining and selling coal in Oklahoma and elsewhere, a creditor of the defendant Kansas City, Mexico & Orient Railway Company, in due time intervened and claimed the superior right in equity to be paid the sum of $27,388.44 from the income or proceeds of the property of said Railway Company for coal furnished by the Coal Company to said Railway Company, which it is alleged was a necessary current expense of operating said road to preserve its property and business and keep it in a going condition, for the four months immediately preceding the appointment of the receivers, which was March 7, 1912, and during the receivership after their appointment. The complainant Trust Company answered the intervening petition, in which it admits the purchase by the Railway Company of coal of the value of $27,388 from the Coal Company in 1911 and 1912, and the use thereof by the Railway Company as fuel in the daily operation of its locomotives and shops between November 15, 1911, and March 7, 1912, and by the receivers of said Railway Company after their appointment, for which payment has never been made, but deny that the interveners are entitled to the payment for such coal from the income or proceeds of the property of the Railway Company prior to the complainant's mortgage liens thereon. After taking much testimony upon the claim of the interveners, and other matters pertaining to the respective earnings of the Kansas Railway Company and of the Texas Railway Company, a corporation of Texas, it was agreed between the complainant, interveners, and the Kansas Company as follows:

"In order to dispense with the taking of evidence, it is agreed between the receivers of the Sans Bois Coal Company and the defendant, the Kansas City, Mexico & Orient Railway Company, and complainant, as follows:

"(1) Said receivers have the legal title to the claim (of the Sans Bois Coal Company) set up in their intervening petition, and the right to recover whatever may be due thereon.

"(2) Between November 15, 1911, and March 7, 1912, the Sans Bois Coal Company sold and delivered to said defendant Railway Company the cars of coal shown in Exhibit A attached to the intervening petition of said receivers, of the price and value of $27,388.44, no part of which has been paid.

"(3) Said coal was sold and delivered by said Coal Company to the defendant Railway Company for use as fuel in the daily operation of its locomotives

and shops, and was necessary to the continued operation of said railway company as a going concern. All said coal was so used by said Railway Company during the time hereinbefore mentioned, except 92 cars thereof, which was on hand, unused, on March 7, 1912. Said 92 cars were taken possession of by the receivers of said defendant Railway Company, and were used by such receivers in their operation of the railroad of said Kansas City, Mexico & Orient Railway Company, subsequent to said March 7, 1912, and were of the value of $6,900.

"(4) Said coal was furnished under a contract in writing (which has been lost) providing in substance that the Coal Company, beginning with June 1, 1911, and ending with July 31, 1912, should furnish to said Railway Company such quantities of screen lump coal (describing it and naming the price per ton) all f. o. b. cars at McCurtain, Okl., as the Railway Company might order for its use. Payments for said coal to be made on the ——— day of each month for the coal furnished during the calendar month preceding. The 92 cars mentioned had been delivered to the Railway Company at McCurtain prior to said March 7, 1912, and were either en route or had actually reached the line of said Kansas Company."

On the final hearing the District Court allowed the claim of the interveners in the full amount thereof, viz., $27,388.44, and adjudged $6,900 of said amount to be prior and superior in equity to the mortgage liens upon the railroad property, and directed the receivers to pay said $6,900 from the income, if any, otherwise from the proceeds of the sale of the property, and allowed the remainder of the claim, viz., $20,488.44, with interest at 6 per cent. from May 18, 1912, as an unsecured claim against the Railway Company. The complainant appeals from the order allowing the $6,900 as prior and superior to the mortgage lien upon the railway property, which is case No. 4550; and the interveners prosecute an appeal to reverse the order decreeing the remainder of their claim to be inferior to the mortgage lien, which is case No. 4552.

The Kansas City, Mexico & Orient Railway Company, referred to in the foregoing stipulation, and in other parts of this opinion, is a railway corporation organized under the law of Kansas, and may be called the Kansas Company; another corporate defendant of the same name is organized under the law of Texas, and may be called the Texas Company. Although it appears that the Texas corporation was owned by the Kansas Company and that the two roads were operated as one system, it is claimed by the complainant that the earnings and accounts of each road and of the receivership of each were kept separately, as required by a law of Texas under which the Texas Company was organized, and that the earnings of neither road were sufficient to pay operating expenses during the receivership and for more than six months prior thereto.

[1] The appellants in No. 4550 earnestly maintain in argument that the District Court erred in allowing the interveners any part of the claim of the Coal Company as a claim against the Kansas Company prior or superior in equity to the claims of the bondholders, upon the ground that to entitle them to such preference it must appear that there was income or revenue from the operation of the railroad prior to the receivership, from which such expenses could have been paid, but was diverted to the payment of interest upon the bonds or to some other nonpreferential claim which inured to the benefit of the bondholders; that in fact there was no such income in this case. In sup-

port of such contention they rely upon Gregg v. Metropolitan Trust Co., 197 U. S. 183, 25 Sup. Ct. 415, 49 L. Ed. 717; Chicago & Alton R. R. Co. v. United States & Mexican Trust Co., above, and other similar cases. We are to determine whether or not the facts in the case before us fall within the rule held in those cases.

(It was said in argument by counsel for intervener that McCurtain, where the coal was to be delivered to the Kansas Company f. o. b., is not on the line of the Kansas Company, but on the line of the Ft. Smith & Western Railroad in Eastern Oklahoma, and had to be transported over that and other lines before it reached the line of the Kansas Company; but when it reached the line of that company is not definitely shown.)

In the Chicago & Alton Case, above, the claim of the interveners was for certain debts due it from the Kansas Company, a connecting carrier with the Chicago & Alton Railroad, for "traffic balances, car repairs, loss and damage claims on shipments of freight, and overcharges paid by the Chicago & Alton for the Kansas Company upon interline freight between January, 1910, and March 7, 1912, when the receivers were appointed," none of which, it was held, was within the class of debts which the receivers were authorized by the order appointing them "to pay out of any income or revenue coming to their hands." In the course of its opinion the court said:

"It is only when current income has been diverted from the payment of current expenses of the ordinary operation of the railroad for wages, supplies, and such necessities of operation, leaving a part of such current expenses unpaid, and applied to the payment of interest on bonds, or of claims for construction, or for unnecessary betterments and the like, which inure to the benefit of the bondholders, that claims for such current expenses may be paid out of the proceeds of the corpus of the property"—citing Gregg v. Metropolitan Trust Co., 197 U. S. 183, 25 Sup. Ct. 415, 49 L. Ed. 717, and some other authorities.

That the court did not hold, or intend to hold, that claims for supplies necessary to preserve the property of the road from going to waste, or its franchises from forfeiture, and to keep it in a reasonably safe condition for operation, to preserve its business and perform its duties to the public as a common carrier, is quite evident from the further language of the opinion, which reads in this way:

"If a claim for the current expenses of the necessities of the operation of a railroad is payable in preference to the claims of secured bondholders out of the corpus of the property in any case in the absence of diversion of the income from such expenses, it is only when such preferential payment is necessary to keep the railroad a going concern, or when its preferential payment is necessary to prevent a loss at least equal to the amount of the payment."

We come, then, to consider the question directly involved in this appeal: Was the $6,900 of the interveners' claim allowed as prior in point of equity to the claim of the bondholders such a claim as might properly be allowed as an operating expense of the receivership under the facts shown by this record? It is deemed necessary to state the questions arising upon this appeal between the interveners and the Kansas Company only.

March 7, 1912, the appellant United States & Mexican Trust Company, an Alabama corporation, which will be called the complain-

ant, the International Construction Company and the Union Construction Company, Delaware corporations, and the Western Tie & Timber Company, an Arkansas corporation, filed in the court below their joint bill of complaint against the Kansas City, Mexico & Orient Railway Company, a Kansas corporation, in which it is alleged, among other things: That the complainant is the trustee in two certain mortgages or trust deeds made by the Kansas Company to said complainant February 1, 1901, upon all of its property, wherever situated, to secure the payment of a large amount of interest-bearing bonds issued and to be issued by said company; that to pay the interest already accrued on said bonds the Kansas Company borrowed money, which it has never repaid; that the Construction Companies and the Western Tie & Timber Company had severally recovered separate judgments against the Kansas Company for large amounts, which it is unable to pay; that in addition to its bonded indebtedness said company owes floating and unsecured debts of divers amounts to divers persons aggregating $1,223,000, also outstanding notes and obligations given for the purchase of equipment and rolling stock in the further sum of $1,644,000, much of which floating indebtedness is past due and the remainder fast maturing; that a large portion of said equipment obligations are past due and the balance maturing in large amounts from month to month; that the pay rolls of said company due to its employés in the various operating departments for the months of January and February are wholly unpaid; that it owes a large amount of taxes in the various jurisdictions through which its lines run, some of which taxes are past due and others maturing soon; that there are now pending in the various courts along the line of said Kansas Company in the states of Kansas and Oklahoma many suits for damages on account of the alleged negligence of its employés in the operation of its roads, which suits are being prosecuted, and many of which will in all probability soon ripen into judgments; that said defendant has no money with which to pay its said pay rolls, its floating debts, its equipment obligations, its taxes, or any of the said claims that are likely soon to ripen into judgments, is wholly insolvent, without credit, and unable to obtain the money for the purpose of discharging said obligations. (Like allegations are made as to the Texas Company.) It is further alleged that there is imminent and immediate danger that other proceedings and suits will be brought to recover judgments against said Kansas Company on account of its floating and other indebtedness, under which judgments its property will be sold and will bring nothing like its fair value.

Other allegations of similar import, not necessary to now state in detail, are made, showing the urgent necessity for the appointment of receivers to take immediate possession of the property of the Kansas Company, and operate the same under the orders of the court, and it is prayed by the complainant Trust Company that its said mortgages or trust deeds may be foreclosed and the property covered thereby sold to pay said mortgage and other indebtedness; and all the complainants join in asking the appointment of receivers of the railroad of the Kansas Company to operate the same under the orders

of the court, to the end that its property as a whole may be protected and preserved for the interest and benefit of the holders of said bonds, and the other creditors of that company, that the amount of their respective claims and demands be ascertained, the priorities of each of said creditors determined, and that the court decree and enforce the rights, liens, and priorities of all of the creditors of the said defendants as the same are finally ascertained by the court.

Upon the same day, March 7, 1912, the court appointed receivers to take possession of all the property, rights, and franchises of said Railway Company, to hold the same as officers of and under the control of the court; and said receivers were ordered and directed to take immediate possession of all of said property within the jurisdiction of the court wherever situated, to continue the operation of said road as a common carrier of passengers and property, and to discharge all duties obligatory upon said defendant, as such common carrier. By section 10 of the order of their appointment the receivers were—

"authorized to pay out of any income or revenues which may come to their hands all debts which may have been lawfully contracted by the Kansas City, Mexico & Orient Railway Company of Kansas, since the 1st day of September, 1911, for services rendered in the operation of its road; * * * also all debts lawfully contracted during the aforesaid period for materials and supplies furnished to said Railway Company and used in the maintenance and operation of its railroad, all traffic balances, if there shall be any due to connecting carriers. * * * And the court reserves to itself the power to direct the payment of such other demands against the Kansas Company, as is may deem to be of a preferential nature."

Some other allegations are deemed not material in the view we take of the case.

On February 2, 1914, a decree of foreclosure and sale was entered in favor of the complainant Trust Company and against the Kansas Company, and the Construction Companies who joined in the original proceedings either withdrew or were dismissed from the suit.

As bearing upon the facts so alleged we may cite the following cases: In Wallace v. Loomis, 97 U. S. 146, 24 L. Ed. 895, which was a suit to foreclose a mortgage on a railroad, receivers were appointed and authorized to raise money upon certificates to be issued by them "to put the road and property in repair, * * * to manage and operate the road to the best advantage, so as to prevent the property from further deteriorating, and to * * * preserve the same for the benefit * * * of the first mortgage bondholders, and all others having an interest therein." The receivers obeyed the order and the court declared the amount due on the receivers' certificates to be a lien upon the property in their hands prior to that of the first mortgage bondholders. The Supreme Court sustained the decree, saying:

"The power of a court of equity to appoint managing receivers of such property as a railroad, when taken under its charge as a trust fund for the payment of incumbrances, and to authorize such receivers to raise money necessary for the preservation and management of the property, and make the same chargeable as a lien thereon for its repayment, cannot, at this day, be

seriously disputed. It is a part of that jurisdiction, always exercised by the court, by which it is its duty to protect and preserve the trust funds. * * * It is, undoubtedly, a power to be exercised with great caution, and, if possible, with the consent or acquiescence of the parties interested in the fund. In the present case, it appears that the parties most materially interested either expressly consented to the order or offered no objection to it."

In St. Louis Trust Co. v. Riley, 70 Fed. 32, 16 C. C. A. 610, 30 L. R. A. 456, the Court of Appeals for this Circuit (Judges Caldwell, Sanborn, and Thayer), upon a full review of the authorities to that date, speaking by Judge Sanborn, said:

"From this brief review of the decisions of the Supreme Court bearing upon this question, we think these propositions may properly be deduced:

"First. There are certain claims against a mortgaged railroad company, accruing before the appointment of a receiver, which are entitled to a preference over a prior mortgage debt in payment out of the earnings of the railroad during the receivership and out of the proceeds of the sale of its property.

"Second. It is an indispensable element of every such claim that it is founded upon property furnished or services rendered to the mortgagor which either preserved or enhanced the value of the security of the mortgage debt, and thereby inured to the benefit of the mortgagee.

"Third. Claims of this character have been given a preference over the mortgage debt by these decisions on one of two grounds,—either (1) on the ground that the mortgage is a lien on the net, and not on the gross, income of the railway company, and where that part of the income that is applicable to the payment of current expenses of operation, proper equipment, and necessary improvements has been diverted to pay interest on the mortgage debt or to otherwise benefit the security, and this diversion has left claims for these expenses unpaid, it is the province and duty of the chancellor to restore the diverted fund by taking an equal amount from the earnings of the railway company during the receivership, and applying it to the payment of these claims in preference to the mortgage debt: * * * or (2) *on the ground that the payment of the claims is necessary to preserve the mortgaged railroad, and to keep it a going concern.* It is indispensable that the operation of a railroad be uninterrupted in order that the travel and traffic of the public may be accommodated, and in order that the franchises of the railroad company may be preserved from forfeiture. Hence the wages of employés, who might otherwise cease from their work, the amounts due to connecting lines of railroad that might otherwise cease their business relations with the managers of the mortgaged property, *and the claims for supplies and materials necessary to keep the mortgaged railroad a going concern,* may, in proper cases, be paid out of the earnings during the receivership, or out of the proceeds of the sale of the mortgaged property, in preference to the mortgage debt." (Italics ours.)

In Illinois Trust & Savings Bank v. Doud, 105 Fed. 123, 44 C. C. A. 389, 52 L. R. A. 481, the Court of Appeals for this circuit again, upon a full consideration of all the cases up to that time bearing upon the question of preferential claims and when the owners thereof were entitled to payment of them from the corpus of railroad property in preference to mortgage liens thereon, said:

"A court of equity engaged in administering mortgaged railroad property under a receivership in a foreclosure suit may prefer unpaid claims for current expenses of the ordinary operation of the railroad, incurred within a limited time before the receivership, to a prior mortgage lien, in the distribution of the income or of the proceeds of the mortgaged property. * * * The test of the preferential equity of a claim is its consideration. If its consideration was a current expense of the operation of the mortgaged property,.

which inured to its benefit, and which was incurred in the ordinary course of its business, within a limited time anterior to the appointment of the receiver, the claim may be preferred."

See, also, Love v. North American Co., 229 Fed. 103, 143 C. C. A. 379, and the cases there cited.

There has been no departure, so far as we can discover, from the principles so announced by the Supreme Court and the Court of Appeals for this Circuit, especially where the claim is for wages, or supplies necessary to keep a road in the hands of receivers in operation as a going concern, and the earnings of the receivership are insufficient to pay such claims. Certainly Gregg v. Metropolitan Trust Co. does not go to that extent. We do not overlook the recent decision of the Court of Appeals in United States Fidelity & Guaranty Co. v. This Complainant, 234 Fed. 238, 148 C. C. A. 140, L. R. A. 1916F, 1067, and need only say that in our opinion the facts in that case render its decision inapplicable to the facts in this case.

From the date of the appointment of the receivers in this suit to the sale of the railway property under the decree of foreclosure in July, 1914, the court was in possession of that property, operating the same through its receivers, as requested by the complainant; representing the bondholders in asking for their appointment. That the claim of the interveners to the extent of the 92 cars of coal used by the receivers was a necessary expense of keeping the road in operation cannot be doubted, in fact is admitted by all parties to this appeal, and unless said coal, or other coal of like kind and quantity, was used by the receivers, the operation of the road would necessarily have been suspended. There is a faint suggestion by counsel for the appellants that the use of this identical coal by the receivers was unnecessary, because they might have procured coal from other sources to keep the road in operation, and for this reason the claim, therefore, should not have been given priority over the bondholders. It is quite true that the receivers might have procured other coal in lieu of this; but, had they done so, they would have been compelled to pay for the coal so procured, and the result would have been the same to the bondholders. Besides, the complainant Trust Company, as the representative of the bondholders, had asked for the appointment of the receivers on or prior to March 7, 1912, because the Railway Company was then insolvent, unable to pay for the necessary fuel and other supplies that it had previously used to keep the road in operation, and requested the court to take possession of and operate the same, to relieve the Kansas Company from being presently compelled to pay its floating debts, which included the coal and other necessary supplies already used, until some arrangements or reorganization could be made that would enable it to pay such debts. The contract by which the fuel was to be furnished by the Coal Company required that it be paid for on a date named in the month following the calendar month in which it was delivered to the Kansas Company. Under such circumstances the court would not have dealt equitably with the Coal Company had it refused to direct its receivers to pay for the 92 cars of coal used by them as a claim prior to the lien of the bondholders, and in our opinion it rightly directed

the receivers to pay for such coal as a claim prior to the bondholders', and its decree so directing is affirmed, and interest on said $6,900 from the date of the decree of the District Court, June 3, 1914, is also allowed as a part of such claim, and as prior and superior to the mortgage lien.

[2] In No. 4552, the interveners challenge the correctness of the decree below denying their claim of priority in payment over the bondholders for $20,488, the remainder of their claim for the coal used by the Railway Company prior to the appointment of the receivers. Under the order of the court appointing the receivers they were authorized to pay the entire claim of the Coal Company, and had they done so the payment could not have been successfully challenged. Upon the final hearing, however, the court declined to give priority over the claim of the bondholders to the extent of $20,488, saying:

"In many matters heretofore submitted and decreed on the same proofs as now before the court in this case, it has been held there was in this case no diversion of income derived from the operation out of which the claim of the intervener could or should have been paid prior to the receivership, and this for the all-sufficient reason that there was no such income from operation derived by the road to divert; on the contrary, the property, as operated by the railway company prior to receivership, was a losing venture. Since receivership intervened, when the receivers at any time have secured from operation more than the actual cost thereof, they have been compelled to expend the same at once in the protection of the property from an entire loss through fixed liens resting on the personal property of the road at the date of their appointment, taxes, charges, assessments, and burdens laid on them by the states through which the road runs, or in protecting the road from the ravages of floods and other disasters. Hence there is in this case no room for the application of the rule of diversion of income, and under the doctrine of the case of Gregg v. Metropolitan Trust Co., 197 U. S. 183 [25 Sup. Ct. 415, 49 L. Ed. 717], and kindred cases, the power or right of a court of equity to decree payment out of the corpus of the property of the demand of intervener, in its entirety, in preference to the fixed lien of the mortgage securing the bonds resting thereon, must be denied."

[3] Counsel for the interveners concede that the case of Chicago & Alton R. R. Co. v. This Complainant controls the decision of this question, unless it can be distinguished from the Chicago & Alton Case, and they maintain that it can be so distinguished. The grounds, however, upon which they so contend, are that in this case the Kansas Company carried a large amount of freight for the Texas Company, or for construction companies building the Texas road, for which it has never been paid, and if paid to the Kansas Company that company would have received a large income, which was diverted to the payment of interest upon its bonded indebtedness, or for permanent improvements or betterment of its road, which should be restored from the corpus of the railway property, to the end that claims for supplies such as the intervener's may be paid therefrom. A great wilderness of figures has been introduced into the record before us from the monthly accounts between the Texas Company and the Kansas Company and their receivers, which it is claimed show that the Texas Company is indebted to the Kansas Company in a large amount. Admitting, without deciding, this to be true, there is no proof that the Kansas Company has in fact ever received any of this indebtedness; and unless the Kansas

Company has so received payment of such indebtedness, we are unable to perceive how it can be chargeable with income *received by it in the operation of its road;* and if not in fact so received, how it could have been diverted from the payment of current expenses to the payment of interest upon its bonded indebtedness or the permanent betterment of its road. From the brief of intervener's counsel we quote its contention upon this question:

"The Texas Railroad issued its mortgage covering the line of railroad thereafter to be constructed for it in the state of Texas, securing an issue of 6,510 bonds, all of which bonds, as well as all the stock of the Texas Railroad, were acquired by the Kansas Company pledged to said trust company as security for the bonds issued by the said Kansas Company under its mortgage aforesaid. The bondholders, therefore, of the Kansas Company, had as security for the payment of their bonds the physical property of the Kansas Company, and all the bonds and stock of the Texas Company. It is quite apparent from the record that Mr. Stillwell, as the president of the two railroads, the construction companies, and the trustee, dominated the affairs of all these companies, and that he used and appropriated the funds of any one of the companies that happened to be in funds for the benefit of any other company which happened to be in need of money. At the time of the appointment of receivers the construction companies were largely indebted to the Texas Company, and the Texas Company was indebted to the Kansas Company to the extent of $242,100. Mr. Doran, auditor of the Kansas Company (and perhaps likewise auditor of the other companies), prepared and submitted a statement, from which it was made to appear that the Kansas Company showed an actual deficit in operations in the year March 1, 1911, to March 7, 1912, of $226,221.99. It appeared, however, from his testimony on cross-examination, that this statement did not show income at all, but 'receipts and disbursements,' and that the item of $226,000 was simply the excess in cash disbursed over cash collected, and that there was uncollected from the Texas Company $242,100. He further admitted that, if the Kansas Company had collected the money due it from the Texas Company, there would have been a deficit during the period mentioned (March 1, 1911, to March 7, 1912) of only $1,349.15, while the net income for the six months period before the receivership (September 1, 1911, to March 7, 1912) showed a surplus of $37,224.72. In other words, the Kansas Company earned sufficient and would have been able to pay all its current operating accounts (including its fuel bills due this intervener), had it received payment from the Texas Company."

All of which shows, admitting this statement to be true, that the Kansas Company did not receive any of this income, even though it may have been entitled to, receive it, from the Texas Company; and unless actually so received by the Kansas Company and diverted by it, such earnings cannot rightly be restored from the proceeds of the property of the Kansas Company by the receivers for the payment of the fuel, which the court declined to allow as a preference over the bondholders. Whether or not the amount said to be owing by the Texas Company to the Kansas Company can be collected by the latter company from the Texas Company is not shown by the record before us; but the court, in declining to allow this part of the intervener's claim prior to the lien of the bondholders, did so without prejudice to the right of the interveners to recover, if they can do so, from the Texas Company its claim, or any part thereof. We are of the opinion that the decree of the court denying the $20,488 as a claim prior to the lien of the bondholders should also be affirmed.

It follows that the decrees of the court below should be and are both affirmed.

The late Judge ADAMS heard the argument of these cases, participated in their decision, and concurred in the result as announced in the foregoing opinions.